E. M. HERNDON, ADMINISTRATOR OF THE ESTATE OF MARVIN O. HOCKETT, DECEASED, v. THE NORTH CAROLINA RAILROAD COMPANY AND SOUTHERN RAILWAY COMPANY.

(Filed 7 June, 1951.)

**Railroads § 4—**

    Evidence tending to show that forty-five feet from the tracks at a grade crossing the headlight of a train approaching from the right could be seen several hundred feet, with greater vision up the track as one came closer to the rails, and that intestate stopped three or four feet from the first rail and then drove upon the track and was hit by an engine a second

thereafter, *is held* to show contributory negligence on the part of intestate constituting a proximate cause of the accident as a matter of law, and nonsuit was proper.

APPEAL by the plaintiff from *Grady, Emergency Judge,* at October Term, 1950, of DURHAM.    Affirmed.

Civil action by plaintiff to recover damages for the alleged wrongful death of his intestate, resulting from a grade-crossing collision between a Blue Bird taxicab driven by the intestate and a train operated by the defendant Southern Railway Company.    The collision occurred on the night of 19 December, 1944, about 10:30 o'clock, at a street crossing in the suburbs of the City of Durham, beyond Erwin Cotton Mills, in what is known as West Durham, where 14th Street crosses the railroad track.

The usual issues of negligence and contributory negligence were raised by the pleadings.    The plaintiff, in a carefully prepared complaint, alleges, in substance, that the intestate's death was due to the defendants' negligence in causing and permitting a train to approach the crossing at a high, unlawful, and careless rate of speed, without due regard for the safety of those using the crossing and without giving any notice or warning whatsoever of the approach of the train, with the engineer failing to keep a proper lookout.    The defendants' answer admits the intestate was driving the taxicab and was killed in the collision, but denies all allegations of negligence.    By way of further defense, the defendants allege that the intestate's death was proximately caused by his own negligence in failing properly to control the taxicab; in failing to heed the warning signals at the crossing; in failing to keep a proper lookout for his own safety; and in heedlessly driving the taxicab upon the crossing in front of an approaching train when he had an unobstructed view of approximately 700 feet down and along the railroad track in the direction from which the train was coming.

The evidence adduced at the trial developed the following background facts:  The railroad runs through the City of Durham in a general easterly and westerly direction.    14th Street runs generally north and south, and crosses the railroad at about right angles.    Mulberry Street runs alongside of and parallel with the track on the north side thereof.    14th Street is a connecting street about 1,300 feet in length, running from Hillsboro Road on the north down to and across Mulberry Street and the railroad track,—continuing on southwardly to the road which leads from the West Durham 9th Street underpass to the vicinity of Duke Hospital, this road being known as Erwin Road.    The Erwin Cotton Mills property is located at the northeast corner of 14th and Mulberry Streets.

Just before the fatal collision, the taxicab driven by the intestate was traveling southwardly on 14th Street.    It was seen moving forward

through the intersection of Mulberry Street (which parallels the railroad on the north). The cab moved up to within 3 or 4 feet of the north rail and stopped momentarily. It then moved forward and stopped again, this time between the tracks, as though "stalled or something," with the train then approaching from the west at a speed estimated by plaintiff's witness David Sloan of from 50 to 60 miles per hour. In the ensuing collision, the pilot (or cowcatcher) of the locomotive became embedded in the metal of the taxicab and carried it down the track about 1,200 feet. Plaintiff's intestate was fatally injured and thrown out of the cab about 175 feet east of the crossing.

The evidence further tends to show that west of the crossing the railroad track curves slightly toward the north, so that, looking west from the crossing in the direction from which the train approached, the railroad curves to the right. It also appears in evidence that at the crossing the railroad track bed was about 4 or 5 feet higher than the surface of the approach from Mulberry Street, thus requiring a motorist traveling southwardly on 14th Street to drive uphill 4 or 5 feet in crossing the railroad. It further appears that the crossing was much used by pedestrians and vehicles; that, being in close proximity to Erwin Mills, it was a noisy crossing; that it was a narrow, one-way crossing, unpaved, rough, and rutted, with the railroad T-irons projecting some 3 or 4 inches above the surface of the street; that there were no blinker lights, bells or gates at the crossing, nor was a watchman maintained thereat.

The evidence fails to sustain the plaintiff's contention that the intestate's vision was obscured by a row of mulberry trees north of the railroad right of way, west of the crossing. The evidence discloses that these trees were not on the railroad right of way proper. They were located on the north side of Mulberry Street (which parallels the railroad), that is, the trees were on the far side of the parallel street from the railroad. This parallel street is about 24 or 25 feet wide. From a point 100 feet west of the crossing, it is 40 feet from the center of the railroad to the south side of the parallel street, and a little less than 60 feet to the north side of that street. The first of these "mulberry trees was about 75 feet from the north side of the track and about 68 feet west of the center of 14th Street." The second tree was approximately the same distance from the track and about 150 feet west of the center of 14th Street, and the third tree about 210 feet from the center of 14th Street. Traveling southwardly on 14th Street, toward the railroad, it is about 85 feet from the track to the mouth of Mulberry Street. The distance from the center of the intersection of 14th and Mulberry Streets to the track is 45 feet.

Plaintiff's witness, S. M. Credle, who made the map and explained the distances and measurements, said when a person is at this point, "45 feet from the railroad track, there are no obstructions there and I think he

could see the headlight of a train for at least 700 feet." He further said:
"When you get there in the center of the intersection of 14th and Mul-
berry there will be no trees that would interfere with a person's vision
up the track. . . . a person looking up the railroad track could see 700
feet, I think. . . . As you get nearer to the track . . . you could see a
considerable distance beyond 700 feet . . ."

Another witness, J. F. Thrift, called by the plaintiff, testified: . . .
"I could see a headlight on a train for 600 or 700 feet up the track."

Plaintiff's eyewitness, David Sloan, said he was sitting in his parked
car on Mulberry Street about 125 feet east of 14th Street, approximately
200 feet from the crossing, headed in the direction of the crossing. He
testified, in part: "After I saw the automobile it never stopped from the
time I saw it until it got in about 3 or 4 feet of the railroad track and
then it stopped. It then started on across the track and got up on the
track. The train hit the car. No, sir, the train did not hit him exactly
right after he drove up on the track, it was about a second after. I heard
the train blow and from where I was sitting I could see the train and the
headlight from the train some distance up here west of the crossing. It
didn't start blowing until about 125 feet down the track, and that is just
an estimate on my part. . . . On this particular night it was cloudy and
dark. . . . It was not exactly cold and my window was all the way down.
. . . There were no obstructions, no buildings in the way to keep me from
seeing it. I could see that engine I would say 300 feet before it ever got
to the crossing. I could hear the train. And I heard the whistle blow.
The train was making the ordinary noise of a train as it comes along the
track. . . . There was a street light over the intersection of 14th Street
and Mulberry Street and it was burning there that night. There was a
North Carolina stop sign on the right-hand side of 14th Street as you
come up to the railroad and that was there that night. There was also a
North Carolina stop sign on the south side of 14th Street as you approach
the railroad. I don't know what the sign had on it, I know it was to stop.
There was a sign at the railroad crossing to stop, which said North Caro-
lina Law Stop. And that was on both sides of the crossing, but I am not
sure whether there was another sign that had a crossing bar on it."

At the close of the plaintiff's evidence, defendants moved for judgment
of nonsuit. The motion was allowed, and from judgment based on such
ruling the plaintiff appealed, assigning errors.

*Claude V. Jones and Egbert L. Haywood for plaintiff, appellant.*

*W. T. Joyner, Spears & Hall, H. E. Powers, and Marshall T. Spears,
Jr., for defendants, appellees.*

JOHNSON, J.   Assuming but not deciding that the evidence offered below made out a *prima facie* case of actionable negligence against the defendants, nevertheless, it is manifest from the evidence adduced that plaintiff's intestate failed to exercise due care under the surrounding circumstances for his own safety and that such failure contributed to, and was a proximate cause of, his death.   The case is controlled by the principles explained and applied in *Carruthers v. R. R.*, 232 N.C. 183, 59 S.E. 2d 782; *Bailey v. R. R.*, 223 N.C. 244, 25 S.E. 2d 833; *McCrimmon v. Powell*, 221 N.C. 216, 19 S.E. 2d 880; *Godwin v. R. R.*, 220 N.C. 281, 17 S.E. 2d 137; *Miller v. R. R.*, 220 N.C. 562, 18 S.E. 2d 232.   See notes and comments: 29 N.C.L.R., p. 301 *et seq.*

In *Godwin v. R. R., supra* (220 N.C. 281, p. 285 *et seq.*), a nonsuit was sustained where it appeared from the plaintiff's testimony that she started her car and drove a distance of about 20 feet across two tracks and onto a third track in front of an approaching train.   In delivering the opinion for the Court, *Stacy, C. J.*, had this to say: "It is the prevailing and permissible rule of practice to enter judgment of nonsuit in a negligence case, when it appears from the evidence offered on behalf of the plaintiff that his own negligence was the proximate cause of the injury, or one of them. . . . The plaintiff thus proves himself out of court. . . . In the application of this rule it is recognized that 'a railroad crossing is itself a notice of danger, and all persons approaching it are bound to exercise care and prudence, and when the conditions are such that a diligent use of the senses would have avoided the injury, a failure to use them constitutes contributory negligence and will be so declared by the court.' . . . We have said that a traveler has the right to expect timely warning, . . . but the failure to give such warning would not justify the traveler in relying upon such failure or in assuming that no train was approaching.   It is still his duty to keep a proper lookout. . . . 'A traveler on the highway, before crossing a railroad track, as a general rule, is required to look and listen to ascertain whether a train is approaching; and the mere omission of the trainmen to give the ordinary or statutory signals will not relieve him of this duty.' "

In *Carruthers v. R. R., supra* (232 N.C. 183), a nonsuit was affirmed where it appeared that at a point about 24 feet from the track the plaintiff's intestate had an unobstructed view up the railroad for 700 feet and that the train approached the crossing without giving any signal or warning.

In *Miller v. R. R., supra* (220 N.C. 562, bot. p. 564 *et seq.*), *Stacy, C. J.*, again speaking for the Court, said: "It is well established by all the evidence that the plaintiff started his car and drove a distance of eight or ten feet onto the crossing in front of an oncoming train, which he

should have seen in the exercise of reasonable care. This was negligence on his part which contributed to the injury." . . .

In *Bailey v. R. R., supra* (223 N.C. 244), it was held that even though it appeared that the defendant was negligent in failing to give warning of the approach of its train, in exceeding the speed limit fixed by municipal ordinance and in allowing the railroad bed to become rough by reason of holes therein and rails protruding 2½ to 3 inches above the roadbed, judgment of nonsuit was proper, since the evidence disclosed that plaintiff's intestate drove on the track in front of a train when he had an unobstructed view down the track for several hundred yards.

In the instant case, the evidence shows unmistakably that the intestate had a clear, unobstructed view of several hundred feet along the track in the direction of the approaching train. The only reasonable inferences deducible from the evidence are that he either (1) looked, saw the train, and gambled on his chance of crossing in safety; (2) looked and failed to see the train; or (3) failed to look before proceeding forward onto the track. In either of these events, he is chargeable as a matter of law with negligence proximately causing or contributing to his death. *Carruthers v. R. R., supra.*

It was a tragic, regrettable occurrence, but this record impels the conclusion that the defendants should not be required to respond in damages.

The judgment below is

Affirmed.