PAUL EDWARD LYDAY v. SOUTHERN RAILWAY COMPANY AND
E. C. KERSTEIN

(Filed 20 January, 1961.)

**1. Automobiles § 83—**

The operation on a highway of a tractor-trailer of a combined length of over 55 feet, the trailer being in excess of 8 feet wide, without a special permit, is a misdemeanor. G.S. 20-116, G.S. 20-119. A permit to operate an oversize vehicle on a designated highway between two designated points is not a permit to operate on a different highway to a different destination.

**2. Automobiles § 6—**

The statutory provisions requiring a special permit to operate oversize vehicles on the highway were enacted in the interest of public safety, and the violation of the statutory restrictions is negligence *per se* and actionable when the proximate cause of injury.

**3. Railroads § 4— Evidence held to disclose contributory negligence of motorist as a matter of law in causing crossing accident.**

The evidence tended to show that the tractor-trailer in question was of a size requiring special permit for operation over a highway, that no permit had been obtained, that the driver attempted to drive the vehicle over a grade crossing, where, by reason of the length of the vehicle, the narrow road and curve in the road at the crossing, the vehicle could not traverse and clear the crossing within the time that it took defendant's train, traveling at lawful speed, to reach the crossing from the place it first came into view from around a curve in the track. *Held*: It was contributory negligence as a matter of law to attempt to traverse the crossing with such vehicle without notifying the railroad company and ascertaining when the vehicle could be moved across in safely, or without sending someone down to the curve in the track to ascertain whether or not the crossing could be made in safety.

APPEAL by plaintiff from *Froneberger, J.,* June Term, 1960, of BUNCOMBE.

This is a civil action to recover damages arising out of a collision which occurred about 11:00 a.m. on 10 October 1959 between the plaintiff's mobile home and one of defendant's passenger trains at the railway crossing on Jim's Branch Road in Buncombe County, North Carolina.

The evidence tends to show that the plaintiff was the owner of a Sterling Mobile Home, hereinafter called a trailer. It contained a living room, two bedrooms, a bath, a kitchen and a hall. This trailer was ten feet wide and 45 feet long. The plaintiff and his family prior to 10 October 1959 had been living in it at 200 Governor's View Road in Beverly Hills in Buncombe County.

Sometime prior to 10 October 1959 the plaintiff had requested one

Clair E. Revell, who was engaged in the business of moving houses, to move his trailer to a new location on Jim's Branch Road. Revell was related to the plaintiff by marriage, and the others, Willard Hunter and Reeves L. Maney, who assisted the plaintiff in moving were his co-employees and friends, all assembled for the purpose of assisting the plaintiff in the removal of his trailer to the new location on Saturday, 10 October 1959. There is no allegation in the complaint with respect to any contract existing between the plaintiff and Revell for furnishing his tractor for the towing and moving of the said trailer.

The evidence tends to show there was no agreement with respect to pay for moving this trailer. The plaintiff so testified, and further testified that he had never received a bill for Revell's services and that the question of pay had never been mentioned.

The plaintiff testified that on the morning of 10 October 1959, Revell arrived at the location of his trailer around 7:30 o'clock and requested him to take him and show him the route that they would have to travel and the point to which they would have to take the trailer. (The plaintiff and Revell had been out to the railroad crossing on Jim's Branch Road the day before.) "He asked me to drive him up there so that he could observe the crossing and the route." After Revell inspected Jim's Branch Crossing on Saturday morning, 10 October 1959, they returned to 200 Governor's View Road where Revell's tractor was hooked to the plaintiff's trailer and was then driven by Revell over U. S. Highway 70 to Jim's Branch Road, a distance of five or six miles. The tractor was 14 feet eight inches long, making the total length of the tractor and trailer 59 feet eight inches.

The main line of the Southern Railway that runs from Winston-Salem to Asheville crosses Jim's Branch Road at a point 50 feet south of U. S. Highway 70, between Swannanoa and Biltmore. Jim's Branch Road is between 16 and 18 feet wide; it is paved from the intersection of U. S. Highway 70 and leads into a rural area in Buncombe County. From where this road leaves U. S. Highway 70, according to the plaintiff's evidence, "it goes downhill in a sort of left curve and then it curves right and straightens up to the railroad tracks and then as soon as it gets over the track it goes downhill." The crossing had a highway stop sign and two railway crossing signs. To the east, from which direction the train approached, by reason of the banks and a curve in the track, the approaching train could be seen as one approached the crossing for a distance of 450 feet.

Revell, who was driving the trailer, did not testify in the hearing below. He was engaged in work out of the State. There is evidence

LYDAY v. R. R.

that Revell stopped before driving the tractor and trailer on the railroad track, but there is no evidence as to whether he looked or listened.

The evidence tends to show that it took considerable maneuvering to get the tractor-trailer in position to cross the railroad track due to the curve in the road between U. S. Highway 70 and the railroad crossing.

The plaintiff further testified that Mr. Hunter passed the tractor-trailer in his car just before it reached Jim's Branch Road and proceeded along Jim's Branch Road, crossed the railroad track and parked his car about 50 feet south of the crossing.

Mr. Hunter testified: "When I got out of my car, I didn't hear anything. I then went back toward the Southern Railway crossing on Jim's Branch Road. I never got all the way to the tracks there at the crossing. * * * I was about 8 or ten feet from the railroad track. * * * At that point Mr. Revell was proceeding across the railroad tracks * * *, the front wheels on the tractor were already across the southernmost track. The rear wheels were approximately in the center of the tracks between the two rails. He moved on very slowly * * * three or four miles per hour. When I first saw the train, it had done come around the curve and was in the portion where the curve begins to straighten out. * * * From the point where I first saw the train to the crossing, I would say it would be about 275 to 300 feet. * * * After that I heard a whistle. * * * I did not hear any bells or whistles prior to that time. * * * As soon as I heard that toot, I ran. * * * I didn't get back to my car. I ran about 40 feet * * * I hollered at the driver of the truck * * *. He got out of the truck before the impact. It was just a split second. * * * I have an opinion * * * as to the speed of the train as it went through the trailer. I would say from 50 to 55 miles an hour."

The plaintiff testified that at the time of the collision the tractor and trailer were moving at a speed of from two to four miles per hour; that he did not see the defendant's train until it was within 250 feet of the crossing; that in his opinion the train was traveling at least 50 to 60 miles per hour. The train did not come to a stop until it had traveled between one-quarter and one-half a mile down the track. The plaintiff offered evidence by two witnesses who were hunting about one-half mile from the crossing and who testified they saw the collision but did not hear any whistle or bell prior to the collision.

On cross-examination, Mr. Hunter admitted that he had a conversation with a Mr. Shotwell, a representative of the railroad, soon

after the accident, which conversation was recorded, and at which time the witness said: " * * * I thought he could come on across like he would in an ordinary vehicle, but I saw that it takes quite a bit of maneuvering and easing around to get one of those things across correct, so I got out of the car and walked back up there, walked back to the crossing, and I was observing the right side of the trailer to see that he didn't drop his wheels and hang them on the track. * * * I was guiding him and trying to see that he didn't hang his wheels up on that track."

This witness further testified on cross-examination: "I was on the west side of the trailer. I could see between the truck and the trailer. The view I had was between the coupling of the truck and the trailer. * * * When I heard the whistle, I saw the train and immediately began running and hollering at the same time."

The plaintiff's witness Maney testified: "I saw it (the train) as soon as it could be seen. It was about 400 feet, blowing as it rounded the curve." This witness further testified that the train was being operated at 50 or 60 miles per hour at the time of the collision.

The defendant's evidence tends to show that the engineer started blowing his whistle for the Jim's Branch Crossing some 1,300 or 1,400 feet east of the crossing at the whistle post for said crossing; that he had blown two long blasts, and as he blew the short blast he saw the tractor-trailer on the crossing, turned loose the whistle cord and put the brakes in emergency. The defendant's evidence further tends to show that the train consisted of eleven cars and was being pulled by two diesel units; the length of the train was approximately 800 feet and the air brakes on the train were in good condition; that the train was being operated at between 35 and 40 miles per hour; that the engineer used his emergency brake and all the appliances at his command, and that the train could not be stopped in less than 1,500 feet. It was being operated downgrade. The engineer further testified "that he did everything in his power to stop the train after seeing the mobile home pulled on the track; that after striking the mobile home, the impact knocked all the air pipes off the front end; the air went down on all the cars. * * * The engine's air pipes and braking facilities were so torn up from the impact that it was necessary to radio to Asheville and have a crew sent out with repairmen to repair the brake lines before the train could be brought to Asheville."

One of the defendant's witnesses who lived on the south side of the railroad crossing involved, testified that she heard the train whistle and saw the train strike the tractor-trailer. She further testified: "On that morning I was working at my sink and looked up and

saw a trailer coming across. I saw the trailer on that crossing more than five minutes before it was struck."

Plaintiff testified that he knew he had to get a permit from the North Carolina State Highway Commission before moving the trailer over the highway. Plaintiff's agent, Revell, owner and driver of the tractor, applied to the North Carolina State Highway Commission on 9 October 1959 (the day before the accident) for a permit to move a house trailer. On the same date, the North Carolina State Highway Commission issued to Revell "a special permit for excessive size house trailer with a width in excess of 8 feet and not to exceed ten feet and an over-all combined length of 65 feet." The weight of the house trailer was 12,000 pounds, to be towed by a one-ton truck from Asheville to Black Mountain via Route U.S. 70. The permit so issued recited that it was subject to State Highway Ordinance reading: "It shall be unlawful for any overwidth house trailer operating under a special permit for overwidth to travel on the highways at a speed in excess of 35 miles per hour, and such vehicle shall at all times be operated to the right of the center line, and as near the right-hand side of the traveled portion of the highway as practicable.

"This permit is granted upon condition that movement will be made during daylight and that no movements will be made on Saturdays, Sundays or Holidays. That all necessary precautions will be taken to safeguard the traveling public, and that you will be responsible for any and all damages whatsoever that may be caused during this movement, and that permission of proper authorities of incorporated municipalities will be obtained for movements over streets which are not on the highway system. * * *"

This permit was introduced in evidence by the defendant over the objection of the plaintiff.

At the close of plaintiff's evidence the defendant moved for judgment as of nonsuit. The motion was denied. The motion was renewed at the close of all the evidence and was allowed. The plaintiff appeals, assigning error.

*Williams, Williams & Morris; James N. Golding for plaintiff appellant.*

*W. T. Joyner, Ward & Bennett for defendant appellee.*

DENNY, J. The plaintiff insists that the permit introduced in evidence was not for the removal of his trailer. Be that as it may, there is no evidence introduced in the trial below tending to show that the plaintiff or his agent, Revell, obtained any permit to move the plain-

tiff's trailer over Jim's Branch Road. Furthermore, there is no contention on the part of the plaintiff that any such permit was ever requested or obtained for such purpose. The permit obtained by Revell on 9 October 1959 only authorized the removal of a house trailer from Asheville to Black Mountain over route U.S. 70.

The pertinent statutes with respect to the size of vehicles permitted to be operated on highways under the control of the North Carolina State Highway Commission without a special permit, are: G.S. 20-116, "(a) The total outside width of any vehicle * * * shall not exceed ninety-six inches, except as otherwise provided in this section; * * * (e) No combination of vehicles coupled together shall consist of more than two units and no such combination of vehicles shall exceed a total length of fifty feet inclusive of front and rear bumpers * * *. Provided, however, that a combination of a house trailer used as a mobile home, together with its towing vehicle, shall not exceed a total length of fifty-five (55) feet exclusive of front and rear bumpers. * * *" G.S. 20-119, "Special permits for vehicles of excessive size or weight. The State Highway and Public Works Commission may, in their discretion, upon application in writing and good cause being shown therefor, issue a special permit in writing authorizing the applicant to operate or move a vehicle of a size or weight exceeding a maximum specified in this article upon any highway under the jurisdiction and for the maintenance of which the body granting the permit is responsible. Every such permit shall be carried in the vehicle to which it refers and shall be open to inspection by any peace officer; and it shall be a misdemeanor for any person to violate any of the terms or conditions of such special permit. * * *"

"The violation of a statute or ordinance, intended and designed to prevent injury to persons or property, whether done intentionally or otherwise, is negligence *per se* and renders one civilly liable in damages if its violation results in injury to another; for in such cases the statute or ordinance becomes the standard of conduct or the rule of the prudent man." *S. v. Cope,* 204 N.C. 28, 167 S.E. 456; *Ham v. Fuel Co.,* 204 N.C. 614, 169 S.E. 180; *McNair v. Richardson,* 244 N.C. 65, 92 S.E. 2d 459. See also *Aldridge v. Hasty,* 240 N.C. 353, 82 S.E. 2d 331; *Holland v. Strader,* 216 N.C. 436, 5 S.E. 2d 311.

Certainly, an attempt to move the plaintiff's trailer over and along Jim's Branch Road without a permit was a misdemeanor. Furthermore, the statute requiring a permit before moving plaintiff's trailer over or upon any highway controlled by the North Carolina State Highway Commission was enacted for the protection of the traveling public. But whether such violation constituted contributory negli-

gence depends on whether or not such violation was a proximate cause or one of the proximate causes of the damages suffered by the plaintiff. *McNair v. Richardson, supra; Aldridge v. Hasty, supra.*

All the plaintiff's evidence tends to show that Revell had considerable difficulty in maneuvering the tractor-trailer into a position after leaving U. S. Highway 70, so that the tractor-trailer could be pulled across the railway crossing. The plaintiff testified that Revell stopped at the crossing about ten seconds before entering it. According to the evidence, when Revell first entered the crossing, the rear nine feet and eight inches of the trailer would still have to be on Highway 70; the plaintiff was in his jeep to the rear of the trailer, and Mr. Maney was in an automobile to the rear of plaintiff's jeep.

The evidence further tends to show that the driver of the tractor-trailer entered the crossing at almost the same moment the defendant's train appeared around the curve some 450 feet east of the crossing. Certainly a driver of an ordinary size vehicle would be guilty of contributory negligence if he failed to get out of the way of a train which could or should have been seen at a distance of 450 feet from the crossing. *Herndon v. R.R.*, 234 N.C. 9, 65 S.E. 2d 320. Here, the 45 foot trailer was only half way across the crossing when struck by defendant's train.

In *Godwin v. R.R.*, 220 N.C. 281, 17 S.E. 2d 137, in delivering the opinion of the Court, *Stacy, C. J.*, said: "It is the prevailing and permissible rule of practice to enter judgment of nonsuit in a negligence case, when it appears from the evidence offered on behalf of the plaintiff that his own negligence was the proximate cause of the injury, or one of them. * * * The plaintiff thus proves himself out of court. * * * (I)t is recognized that 'a railroad crossing is itself a notice of danger, and all persons approaching it are bound to exercise care and prudence, and when the conditions are such that a diligent use of the senses would have avoided the injury, a failure to use them constitutes contributory negligence and will be so declared by the court.' * * * We have said that a traveler has the right to expect timely warning, * * * but the failure to give such warning would not justify the traveler relying upon such failure or in assuming that no train was approaching. It is still his duty to keep a proper lookout. * * * 'A traveler on the highway, before crossing a railroad track, as a general rule, is required to look and listen to ascertain whether a train is approaching; and the mere omission of the trainmen to give the ordinary or statutory signals will not relieve him of this duty.' "

In the case of *Moore v. R.R.*, 201 N.C. 26, 158 S.E. 556, our Court

said: "When approaching a public crossing the employees in charge of a train and a traveler upon the highway are charged with the mutual and reciprocal duty of exercising due care to avoid inflicting or receiving injury, due care being such as a prudent person would exercise under the circumstances at the particular time and place. 'Both parties are charged with the mutual duty of keeping a careful lookout for danger and the degree of diligence to be used on either side is such as a prudent man would exercise under the circumstances of the case in endeavoring to perform his duty.' *Improvement Co. v. Stead*, 95 U.S. 161, 24 Law Ed., 403 * * *."

The court in its opinion in the *Moore* case quoted with approval from the case of *B. & O. Railroad Company v. Goodman*, 275 U.S. 66, 72 Law Ed., 167, where it is said: "When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train — not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal, and takes no further precautions, he does so at his own risk."

One of the plaintiff's witnesses testified that he saw the defendant's train as soon as it could be seen; that it was blowing as it rounded the curve. All of plaintiff's evidence tends to show that the approaching train could not be seen for a distance of more than 450 feet from Jim's Branch Road Crossing. The defendant's train, if traveling at 50 miles an hour, its minimum speed according to the evidence offered by the plaintiff, would require less than six and one-quarter seconds to travel 450 feet. If the defendant's train was traveling at the minimum speed of only 35 miles an hour, as its evidence tends to show, it would have required only nine seconds for the train to travel the 450 feet from the point where it could be seen to the crossing. Yet the tractor-trailer traveling at the minimum speed fixed by the plaintiff's evidence, would require approximately twenty seconds to move across the crossing from the time it reached the north rail of the railroad track. At the maximum speed fixed by the plaintiff's witnesses at which the tractor-trailer was being operated, it would have required ten seconds of travel time to get the tractor-trailer across the track of defendant's railroad. Moreover, there is no evidence tending to show that the engineer of defendant's train could have stopped

the train before colliding with plaintiff's trailer after the engineer saw the tractor-trailer on the crossing.

The tractor-trailer combination was of such size and length that it could not be legally moved over any highway under the control of the State Highway Commission without a special permit. The equipment was heavy and cumbersome, wholly incapable of rapid acceleration under the circumstances; the crossing was narrow, the road approaching the crossing was crooked and difficult to negotiate due to the combined length of the tractor-trailer. Therefore, under the facts as revealed by this record, we are of the opinion that it was the duty of the plaintiff to notify the railroad before undertaking to move its tractor-trailer across this particular crossing, and to have requested a time when the equipment could be moved across said crossing in safety, or to have sent someone down to the curve in the railroad to ascertain whether or not the crossing could be made in safety. *T. E. Ritter Corporation v. Rose*, 200 Va. 736, 107 S.E. 2d 479; *Schwesinger v. Hebert*, ...... Ore. ......, 348 P 2d 249. Neither the plaintiff nor the driver of the tractor-trailer had the right to assume that no train was approaching or would approach during the unusual time required to move this slow-moving equipment across the track of defendant's railroad.

For the purposes of this appeal, we have assumed, without deciding, that the defendant was negligent in failing to give timely notice of the approach of its train to Jim's Branch Road Crossing. Even so, for the reasons stated, we are constrained to uphold the ruling of the court below.

Judgment of the court below is

Affirmed.