**Robert Earle HUNTER, Appellee,**

v.

**SEABOARD COAST LINE RAILROAD COMPANY, Appellant.**

**No. 14584.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1970.

Decided May 14, 1971.

John R. Jolly, Jr., and James R. Trotter, Rocky Mount, N. C., (Spruill, Trotter & Lane, Rocky Mount, N. C., on brief) for appellant.

William L. Thorp, Jr., Rocky Mount, N. C., and T. LaFontine Odom, Charlotte, N. C. (Weinstein, Waggoner, Sturges, Odom & Bigger, Charlotte, N. C., and Thorp & Etheridge, Rocky Mount, N. C., on brief) for appellee.

Before HAYNSWORTH, Chief Judge, and BOREMAN and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

At a crossing in Battleboro, North Carolina, on November 14, 1967 about 8:00 A.M., a train of the Seaboard Coast Line Railroad Company struck a tractor-trailer operated by Robert Earle Hunter. In an action for damages alleging the railroad's negligence as the

Haynsworth, Chief Judge, concurred and filed opinion.

cause of his injuries, Hunter obtained a jury award of $200,000.00. Appealing, the company assigns several errors, but only two are of substance: the failure of the trial judge to rule, at or after trial, that on the evidence the company was free as a matter of law from any causal neglect, or, alternatively, that the plaintiff was contributorily negligent. Neither ruling, we conclude, would have been proper.

The disaster occurred where Elm Street, extending east and west, traverses the carrier's tracks running north and south. As Hunter approached from the west, besides a spur track not of significance here, there were three sets of rails in front of him, with the nearest or westernmost a "passing" track. Next in order were the southbound main line, 13 feet from the passing track, and then the northbound at an additional 13 foot distance. The tractor, itself slightly more than eight feet long, was drawing an empty flat bed trailer 37 feet in length. The weather was clear but the cab of the tractor was closed, except the window on the driver's left was open a few inches.

Hunter relates he first stopped his rig at the intersection of Elm and Railroad Avenue, approximately 66 feet from the crossing. Continuing slowly—he says in the lowest of the tractor's ten gears—he paused again, just before reaching the passing track. There he peered first northward, where visibility was not more than 50 to 100 feet, and seeing nothing in that direction, looked to the south for any movement on the passing track. Fourteen feet from him on the south side of Elm Street, and seven and one-half feet from the nearest rail of the passing track, was a brick railroad building, 18 feet tall. On this account, for Hunter to obtain requisite observation of the passing track to the south— beyond the clear 14 feet between the crossing and the building—he had to stop with the front of the tractor upon, or nearly upon, the passing track, the driver's seat being almost eight feet to the rear of the tractor's fore fender.

Hunter adduced evidence of visual blockage to his left, to the north of the intersection, when he stopped approximately 10 feet from the passing track. About 339 feet from the crossing was a warehouse 14 feet high, abutting the passing track. Seven feet beyond this warehouse was the depot building, 17 feet in height. Adjoining these, farther on, was a concrete block warehouse, 13 feet high. The three buildings together fronted 290 feet upon, and less than 30 feet from, the southbound line. Also, the plaintiff said there were two piles of land plaster 10 or 12 feet high between the first warehouse and the crossing. In addition, testimony for the plaintiff places two freight cars on the passing track from 30 to 45 feet to Hunter's left.

In summary, he stated that before he started across the passing track these buildings and the other objects, all situated on property owned by the railroad, blocked his view to the north so that he "couldn't see a very short distance down the track, but the distance I saw, the track was clear as far as I could see". He estimated this distance at "from 50 to a hundred feet".

Hunter and his witnesses could not recall having heard any warning of the train's approach. After he had looked to the left and then to the right, he drove over the passing track and onto the southbound line. Then it was that the locomotive of Seaboard's train came from his left, the north, and crashed into the tractor-trailer, striking it near the connection of the two units. The train's speed exceeded 77 mph.

The engineer testified that he began, and continued until the collision, to sound the whistle from about 650 feet north of the crossing. Furthermore, alert to the calamity confronting him, he applied the emergency brake and sounded the distress signal as soon as the vehicle was discoverable. Attacking the plaintiff's argument on the confined space for sighting the train, the railroad notes that looking northward from the

center of the crossing, the tracks were straight and the view unobstructed for more than 3800 feet, and southward for 2200 feet. Also stressed is that Hunter was familiar with the perilous situs of the disaster, having driven this way on prior occasions. Witnesses for the defendant denied there were any railroad cars on the passing track to the north of the intersection at the time of the collision.

The railroad presses that Hunter should have looked to his left, northward, a second time before moving on after his second stop. Hunter excuses this omission by saying that he was necessarily absorbed in a lookout to his right, southward, down the passing track, after determining the track clear to the north. He accounts for his attention to the passing track by pointing out that it was the nearest. To his knowledge it was not dormant and a cautious motorist could still fear a shunting of cars upon it.

By calculation, a train moving at more than 77 mph would come from behind the buildings to his left, 339 feet away, to the crossing in no more than three seconds. Even under ideal circumstances, it appears that Hunter would have had a maximum of six seconds in which to identify, locate and respond to the train's whistle had it been given as represented, 650 feet north of the crossing.

North Carolina law governs—since this is a diversity case—in determining the respective obligations of the truck driver and the railroad at grade crossings. In Price v. Seaboard Air Line Railroad Co., 274 N.C. 32, 161 S.E.2d 590, 595 (1968), the Court announced the doctrines applied in 1965, and nothing appears to render them inapposite in 1967, when Hunter was hurt. Concerning the scope of vision afforded a traveler of a train's imminence, this is the exposition:

"A railroad is under a duty to exercise reasonable care to maintain its crossings over a public highway in a reasonably safe condition so as to permit safe and convenient passage over them by persons exercising ordinary care in the use thereof. A railroad company is not an insurer of the safety of travelers, and it is not required to maintain a foolproof crossing or a crossing where no injury is possible. In general, a railroad company is only liable for a defect or condition on its right of way over a public crossing which is caused by its negligence and which renders crossing unnecessarily unsafe and dangerous to persons having occasion to use the crossing, while in the exercise of reasonable care; and such negligence is a proximate cause of the injuries complained of. * * * "

In regard to cautioning a traveler of a coming train, Cox v. Gallamore, 267 N.C. 537, 148 S.E.2d 616, 620 (1966) said:

"Even though the railroad has posted signs which are adequate to give a traveler upon the highway notice of the presence of a railroad crossing, it is also the duty of the railroad to give timely warning of the approach of its train to the crossing by the blowing of the whistle or horn, by ringing the bell or by some other device reasonably calculated to attract the attention of those approaching the crossing upon the highway. * * * "

* * * * * *

" 'It is negligence *per se* * * * to omit to give, in reasonable time, some signal from a train moving * * * when it is hidden from the view of travelers, who may be approaching and in danger of coming in collision with it, by the cars of the company left standing on its track, or by an embankment, a cut, or a sharp curve in its line, or by any other obstruction allowed to be placed or placed in any way by the company. [Citations omitted.]' "

Cox wholly refuted the contention that the North Carolina statute, G.S. § 136–20, entrusted to the State Highway Commission, and relieved the railroad of, the duty to install gates and signals

at a crossing where vision is obstructed, such as now in consideration. Also, the Court outlined the driver's duty:

> "On the other hand, the driver of an automobile, who knows, or, by the exercise of a reasonable lookout in the direction of his travel, should know, that he is approaching a railroad crossing, may not proceed to and upon it without looking in both directions along the track merely because he has heard no signal of an approaching train. The driver, who knows, or should know, that he is approaching a crossing at which his view of the track is obstructed, owes to the passengers in his vehicle the duty to reduce his speed so that he can stop the vehicle, if necessary, in order to avoid a collision with an approaching train. * * * " 148 S.E.2d at 621.

Without observance of this duty, the Court added, the plaintiff would be contributorily negligent and barred of recovery. In accord with this enunciation of the relative duties of the railroad and motorist is the recent decision in Brown v. Atlantic Coast Line Railroad Co., 276 N.C. 398, 172 S.E.2d 502 (1970).

■ There was no peremptory requirement of law—and its omission not negligence per se—that before crossing, Hunter should stop at a safe location, leave his vehicle and walk forward to ascertain if passage could be made without danger. This is the general law articulated in the learned opinion of Mr. Justice Cardozo in Pokora v. Wabash R. R., 292 U.S. 98, 54 S.Ct. 580, 78 L.Ed. 1149 (1933). On the other hand, if the circumstances arguably demanded this reconnaissance to meet the requisites of care exacted of a driver, then his failure to do so could constitute contributory negligence.

That this is the State law is gained too from the statute defining the duties of a driver upon nearing a grade crossing regulated by the public "road governing body". The provision is that: " * * * No failure so to stop [in accordance with the regulations], however,

shall be considered contributory negligence per se in any action against the railroad * * * for injury to person or property; but the facts relating to such failure to stop may be considered with the other facts in the case in determining whether the plaintiff was guilty of contributory negligence * * *." G.S. § 20–143. While the crossing in suit did not come within its coverage, this statute conclusively infers the attitude of the State in crossing situations generally.

Against this explication of the driver's duty, defendant relies particularly upon Lyday v. Southern Ry. Co., 253 N. C. 687, 117 S.E.2d 778 (1961). The features of that litigation are so different from those in Hunter's case that we do not think it is preclusive here of recovery. There the plaintiff violated a statute forbidding the movement on the highway without a special permit of a mobile home of uncommonly large dimensions. The combined length of the tractor and trailer was approximately 60 feet. Getting to the tracks where the collision occurred involved an intricate maneuver. Due to the vehicle's cumbersomeness it could not readily accomplish a sharp curve in the highway immediately leading to the tracks. These circumstances and the requirement of a permit should have impressed upon the driver the extraordinary diligence expected of him. It was not demandable of Hunter. Further, in Lyday the plaintiff neither looked nor listened before driving upon the tracks. A nonsuit was rightly granted by the trial court for contributory negligence. Likewise Arvin v. McClintock, 253 N.C. 679, 118 S. E.2d 129 (1961), and the other precedents cited by the defendant do not in our reading strengthen its defense of contributory negligence.

■ Resolution of the charges and denials of negligence and the charges and denials of contributory negligence, is for the jury under North Carolina jurisprudence, if the evidence is sufficient in law to justify submission of them. Cox v. Gallamore, supra, 267 N.C. 537,

148 S.E.2d 616, 621 (1966). Federal law, however, is the judge of the sufficiency. Wratchford v. S. J. Groves & Sons Company, 405 F.2d 1061, 1066 (4 Cir. 1969). The point is posed here by the railroad's motion for a directed verdict and later for a judgment non obstante veredicto.

For decision we must look to the evidence in the light most favorable to the plaintiff. Price v. Seaboard Air Line Railroad Co., supra, 274 N.C. 32, 161 S.E.2d 590, 596 (1968). Thus appraised, we think the proof warranted a plaintiff's verdict. The facts were not "plainly conclusive" against the plaintiff's recovery, and the "jurors could reasonably come to a contrary conclusion". Richmond Television Corp. v. United States, 354 F.2d 410, 414 (4 Cir. 1965); Grooms v. Minute-Maid, 267 F. 2d 541, 543 (4 Cir. 1959). The jury will be upheld.

Affirmed.

HAYNSWORTH, Chief Judge (concurring):

I join in the conclusion of my brothers, though not without some difficulty.

My difficulties stem principally from the fact that most of the obstructions to the north, detailed in Judge Bryan's opinion, were effective obstructions of Hunter's view only when he stopped at a street intersection before he reached the railroad crossing. By the time he reached a position near the crossing, from which he should have been on the lookout for trains, the warehouse 339 feet north of the crossing, the depot, the other warehouse beyond it, and the piles of land plaster were no longer obstructions in the way of his view.

According to some testimony introduced on the part of the plaintiff, however, though sharply contradicted by the defendant, there were some box cars on the "passing" track * north of the crossing. If the box cars were there, and the jury's verdict requires us to consider the case as if they were, Hunter's view to the north would have been obstructed by the box cars after he had closely approached the passing track and until his cab cleared an extension of the edge of the parked cars.

My difficulty is compounded by the fact that, according to Hunter's own testimony, once he cleared the warehouse on his right, there was nothing to obstruct his view to the south. Nevertheless, he proceeded on to the crossing looking fixedly to the south and never again glancing northward. If the box cars were on the passing track north of the crossing, thus partially obstructing his view, one would think that a prudent man would concentrate his attention to the north where the obstruction was, rather than on the south where there was no obstruction.

Still, viewing the evidence in the light most favorable to the plaintiff, as we must, including the presence of the parked box cars, there was such a short space in time and in distance in which Hunter could have observed the train approaching at almost eighty miles an hour, before he began to cross the southbound tracks, that I cannot say his failure to effectively avail himself of that fleeting opportunity was negligence as a matter of law.

For these reasons, therefore, I agree with my brothers that the case was properly submitted to the jury.

---

\* The track is variously referred to as a passing track or a house track. Photographs taken shortly after the collision show it to have been overgrown with weeds and having none of the appearance of a passing track for regular use in passing.