Judy C. **MAKAS, Administrator C.T.A. of the Last Will of Callie G. Cranfill, Plaintiff,**

v.

**HILLHAVEN, INC., Defendant.**

**No. C–81–649–WS.**

United States District Court,
M.D. North Carolina,
Greensboro Division.

July 16, 1984.

Weston P. Hatfield and Carol L. Allen, Winston-Salem, N.C., for plaintiff.

Roddey M. Ligon, Jr., and Anthony H. Brett, Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., Malcolm J. Harkins, III, and Francis J. LaPallo, Casson, Calligaro & Mutryn, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

HIRAM H. WARD, Chief Judge.

This negligence action came on for trial before the Court and a jury on July 9, 1984. Plaintiff is the administratrix of the estate of Callie G. Cranfill. Defendant owns and operates the Winston-Salem Convalescent Center, a nursing home where Callie Cranfill was a residential patient from July 1979 until her death on March 3, 1983. Prior to opening statements and the presentation of evidence the parties were heard on Defendant's Motion to Dismiss or for Summary Judgment or for a Directed Verdict (June 25, 1984). Defendant premised its motion on plaintiff's intention to rely exclusively on N.C.Gen.Stat. §§ 130-264—277 (1981)[1] the "Nursing Home Patients' Bill of Rights," to establish the standard of care from which defendant's care of Callie Cranfill allegedly deviated. The Court reserved ruling on the motion pending at least the close of plaintiff's evidence. In the midst of testimony from plaintiff's second witness and following argument in the jury's absence, the Court ruled as a matter of law that the Nursing Home Patients' Bill of Rights does not establish a statutory standard of care from which the defendant, a "health care provider" within the meaning of N.C.Gen.Stat. § 90–21.12, can be found liable for damages in a private action for negligence. Plaintiff disagreed, informed the Court that it would offer no evidence of the applicable standard of care other than the declaration of patients' rights, N.C.Gen. Stat. § 131E–117, of the Nursing Home Patients' Bill of Rights, and requested the Court to immediately direct a verdict in defendant's favor.[2] The Court, believing that the controlling issue had been sufficiently explored and defined, complied.

## FACTS

Even though plaintiff had planned to call several more witnesses, the facts central to the claims can be gleaned from plaintiff's completed testimony. In 1979, plaintiff's great-grandmother, Callie Cranfill, age 100, lived in Crystal Towers, a Winston-Salem, North Carolina, high-rise apartment building for the elderly. Mrs. Cranfill lived alone and was mobile with the assistance of a cane. Plaintiff, Mrs. Cranfill's only local relative, visited her frequently. During Mrs. Cranfill's last year at Crystal Towers, plaintiff realized that her great-grandmother was encountering increasing difficulty in living alone and caring for herself. Plaintiff found it necessary to visit Mrs. Cranfill daily. Plaintiff felt Mrs. Cranfill was senile. She suffered several unexplained injuries—cuts, falls, bruises, sprained ankle. Considering these injuries Dr. William J. Spencer, Mrs. Cranfill's treating physician, recommended that she be placed in a nursing home. Plaintiff selected the Winston-Salem Convalescent Center (WSCC) and moved Mrs. Cranfill there in July 1979.

WSCC provides intermediate and skilled nursing care to its patients. Initially, Mrs. Cranfill was an intermediate care patient at WSCC. Her ability to care for herself continued to deteriorate. She lost control over her bowel and bladder functions. She experienced a fall and thereafter was unable to walk. Following hospitalization for an ulcer, Mrs. Cranfill became a skilled nursing patient at WSCC. Mrs. Cranfill's phys-

---

1. Effective January 1, 1984, N.C.Gen.Stat. §§ 130–264—277 were repealed and reenacted with changes not material to this action as N.C. Gen.Stat. §§ 131E–115—128 (1983 Cum.Supp.). Statutory references to the Nursing Home Patients' Bill of Rights will hereinafter be to the current codification.

2. Plaintiff had called only two of an anticipated sixteen witnesses. Counsel explained that rather than further build the record plaintiff preferred to appeal the court's ruling on the applicable standard of care.

ical and mental condition was such that she could have benefitted from a personal full-time attendant, but financial resources available to her or plaintiff would not support such a level of care.

Plaintiff continued to visit Mrs. Cranfill at WSCC and for a while deemed the care acceptable. However, after Mrs. Cranfill lost control of her bowel and bladder functions and could no longer visit the bathroom by herself, plaintiff began to find Mrs. Cranfill sitting or lying in her own waste. There came a time when plaintiff would visit WSCC three times daily, usually around meal time so that she could feed Mrs. Cranfill who was virtually unable to feed herself in an orderly manner. Plaintiff testified that she continuously found Mrs. Cranfill soiled with her own wastes and opined that Mrs. Cranfill had been so soiled for a considerable period of time. She complained to defendant's nurses and nurse's aides about this problem. At times, the WSCC staff kept Mrs. Cranfill, her linens, and her room clean and responded to plaintiff's complaints. However, in plaintiff's mind, these satisfactory times were few and far between. Her testimony referred to unsanitary and uncomfortable room conditions and to a WSCC staff that was rude and unreasonably forceful to Mrs. Cranfill and unresponsive to plaintiff's requests.

On one visit in March 1981, plaintiff found Mrs. Cranfill in a dreadful state. She had severe bruises about her eye, mouth, hands, and wrists. Photographs taken the following day, depict the severity of Mrs. Cranfill's condition. Plaintiff's Trial Exhibits Nos. 1–4. Like plaintiff, the Court finds the pain and agony illustrated by the photographs extremely difficult to put into words.

Plaintiff had previously complained about the cold temperature in Mrs. Cranfill's room and on this day found the window open letting in outside wintry air. A nurse's aide explained that she had opened the window to allow the odor to escape. Apparently the nurse's aide knew nothing about Mrs. Cranfill's physical condition. Upon inquiry from plaintiff about Mrs. Cranfill's bruises, a nurse on duty stated she did not know what plaintiff was talking about. Plaintiff complained to William H. Beilfuss, then Administrator of WSCC. Beilfuss searched in vain for an accident report and told plaintiff he would investigate the matter. Plaintiff never received an accident report and stated that Beilfuss had no adequate explanation for the circumstances. Dr. Spencer could not say what happened to Mrs. Cranfill.

Plaintiff continued to complain about Mrs. Cranfill's care and on September 9, 1981, filed this lawsuit alleging that the defendant acted negligently in its care of Mrs. Cranfill.[3] Plaintiff's theory of recovery and trial strategy was negligence per se based on defendant's failure to comply with the requirements of the Nursing Home Patients' Bill of Rights.

## DISCUSSION

In this diversity case the Court must apply the law as announced by the North Carolina Supreme Court. The North Carolina Supreme Court has not had occasion to consider the Nursing Home Patients' Bill of Rights or rule whether it sets the standard of care in a negligence action against a "health care provider." Currently there is no provision under North Carolina law for a Federal trial judge to certify unsettled questions of State law to the North Carolina Supreme Court for resolution. Consequently, the Court must apply the law as it appears that the North Carolina Supreme Court would rule. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Brendle v. General Tire & Rubber Co.*, 505 F.2d 243, 245 (4th Cir.1974). It is elementary that in performing this task, the Court must not be gov-

---

**3.** In the Complaint (removed from state court) (October 13, 1981) and Order on Final Pretrial Conference (June 16, 1983), plaintiff indicated she intended to pursue a breach of contract claim. Plaintiff abandoned this theory in her Memorandum Trial Brief (June 22, 1984) and Request for Instructions to Jury (June 22, 1984).

erned by sympathy, prejudice or even public opinion.

■ As in any negligence action, in order to avoid a directed verdict in an action against a health care provider the plaintiff must offer evidence on (1) the standard of care owed by the defendant; (2) breach of the standard of care by defendant; (3) proximate causation; and (4) damages. *Mitchell v. Parker*, 68 N.C.App. 458, 315 S.E.2d 76 (1984). Section 90–21.12, N.C. Gen.Stat., speaks to the applicable standard of care.

> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

By definition, defendant is a "health care provider." N.C.Gen.Stat. § 90–21.11.[4]

■ In enacting N.C.Gen.Stat. § 90–21.12 the legislature did not depart from established principles of malpractice law or create a new standard of care by which a defendant's actions are judged. *Simons v. Georgiade*, 55 N.C.App. 483, 493–495, 286 S.E.2d 596, 603, *disc. rev. denied*, 305 N.C. 587, 292 S.E.2d 571 (1982) (N.C.Gen.Stat. § 90–21.12 does not alter the standard of care developed in case law). Furthermore, the statute does not abrogate the duty of medical professionals to exercise their best judgment and reasonable care and diligence in the treatment and care of patients.

The statute refines the definition of same or similar communities, *Wall v. Stout*, 310 N.C. 184, 192, 311 S.E.2d 571, 577 n. 1 (1984), and specifically identifies health care providers whose conduct is to be judged by the applicable standard of care. That standard, as recently explained by the North Carolina Supreme Court, requires health care providers who render services to patients to exercise their best judgment and reasonable care and diligence, and to comply with the " 'standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities.' " *Wall v. Stout*, 310 N.C. at 193, 311 S.E.2d at 577.

■ In ordinary negligence cases, juries are capable of determining whether a party acted as a reasonable and prudent person would have acted under the same or similar circumstances. However, a lay trier of fact, whether it be a court or a jury, does not possess adequate knowledge or information regarding the level or degree of knowledge, skill, experience, etc. which medical personnel should possess. The trier of fact also often lacks the ability to evaluate whether a particular application of health care services violated the required standard of care and/or proximately caused injury. For that reason, expert testimony on the applicable standard of care and any departure therefrom is usually required in medical malpractice actions. *Smithers v. Collins*, 52 N.C.App. 255, 278 S.E.2d 286, *disc. rev. denied*, 303 N.C. 546, 281 S.E.2d 394 (1981) (in most malpractice actions expert testimony is required to establish the standard of care); *Lowery v. Newton*, 52 N.C.App. 234, 278 S.E.2d 566, *disc. rev. denied*, 304 N.C. 195, 291 S.E.2d 148 (1981) (applicable standard of care must be established by expert). Expert testimony is not required, however, in all medical malpractice actions. When the

---

**4.** Section 90–21.11, N.C.Gen.Stat., includes within the meaning of "health care provider" a nursing home as defined in N.C.Gen.Stat. § 130–9(e)(2). Section 130–9(e)(2), N.C.Gen.Stat., has been repealed and reenacted as N.C.Gen.Stat. § 131E–101(6) which, like its predecessor, pro-

vides that a nursing home is one for chronic or convalescent patients who have remedial or other ailments for which medical and nursing care are indicated but are not sick enough to require general hospital care.

jury, based on its common knowledge and experience, can understand, evaluate, and judge the legal reasonableness of a health care provider's actions, expert testimony is not needed. *Jackson v. Mountain Sanitarium & Asheville Agricultural School,* 234 N.C. 222, 225–228, 67 S.E.2d 57, 61–62 (1951); *Powell v. Shull,* 58 N.C.App. 68, 293 S.E.2d 259, *disc. rev. denied,* 306 N.C. 743, 295 S.E.2d 979 (1982); *Smithers v. Collins,* 52 N.C.App. at 259–261, 278 S.E.2d at 289.

Plaintiff identified none of its witnesses as experts and represented to the Court that she did not intend to offer any expert testimony on the applicable standard of care. Plaintiff contended that the Nursing Home Patients' Bill of Rights established the standard of care and that under the doctrine of negligence per se, she only needed to offer evidence of a violation of the statute by defendant which proximately caused injury to plaintiff.

 Negligence per se in effect is a presumption that one who has violated a safety statute has violated its legal duty to exercise due care. Such a statute serves as a legislative declaration of the standard of care applicable in negligence actions. *Springer v. Joseph Schlitz Brewing Co.,* 510 F.2d 468, 472 (4th Cir.1975); *Bell v. Page,* 271 N.C. 396, 156 S.E.2d 711 (1967).

The Nursing Home Patients' Bill of Rights is intended to "promote the interests and well-being of the patients in nursing homes and homes for the aged and disabled ...." N.C.Gen.Stat. § 131E–115. Nursing home facilities are to treat their patients in accordance with the statutory requirements. Among other rights, patients have the rights

(1) To be treated with consideration, respect, and full recognition of personal dignity and individuality;

(2) To receive care, treatment and services which are adequate, appropriate, and in compliance with relevant federal and State statutes and rules;

. . . . .

(6) To be free from mental and physical abuse and, except in emergencies, to be free from chemical and physical restraints unless authorized for a specified period of time by a physician according to clear and indicated medical need.

N.C.Gen.Stat. § 131E–117(1), (2), (6) (formerly N.C.Gen.Stat. § 130–266). Patients or their representatives may institute a civil action for *injunctive* relief to enforce provisions of the Nursing Home Patients' Bill of Rights. N.C.Gen.Stat. § 131E–123 (formerly N.C.Gen.Stat. § 130–272). The Department of Human Resources is responsible for enforcement and has the authority to revoke a facility's license and to impose administrative financial penalties. N.C.Gen.Stat. §§ 131E–124—126 (formerly N.C.Gen.Stat. § 130–273—275). No provision for a private action for damages is made.

 The Nursing Home Patients' Bill of Rights is a statute designed to regulate nursing homes for the protection and benefit of patients like Callie Cranfill. The negligence per se doctrine does not depend on the grant of a private right of action by the legislature and, in the absence of specific legislative exemption, violation of a safety statute generally constitutes negligence as a matter of law. *Springer v. Joseph Schlitz Brewing Co.,* 510 F.2d at 473; *Watson Seafood & Poultry Co., Inc. v. George W. Thomas, Inc.,* 289 N.C. 7, 220 S.E.2d 536 (1975); *Byers v. Standard Concrete Products Co.,* 268 N.C. 518, 151 S.E.2d 38 (1966). Nevertheless, to hold that the Nursing Home Patients' Bill of Rights sets the standard to which nursing homes are held accountable in negligence damage actions would ignore the purpose of the negligence per se doctrine and the malpractice law of this state. It would permit the trier of fact to set its own standard of care for health care providers and speculate virtually without limits on the culpability of their conduct.

 The basis of negligence per se is that the statute prescribes the standard of conduct or the rule of the prudent person.

*Lyday v. Southern Railway Co.*, 253 N.C. 687, 117 S.E.2d 778 (1961). In this and other negligence actions against health care providers, N.C.Gen.Stat. § 90–21.12 sets the applicable standard of care. Thus, there is no reason to resort to the negligence per se presumption. To do so would be in conscious disregard of N.C.Gen.Stat. § 90–21.12, a statutory standard recognized as applicable by the North Carolina Supreme Court. Moreover, the rights declared by the Nursing Home Patients' Bill of Rights are so general and nebulous that a trier of fact could not determine whether the standard had been violated. The patient's rights are so broadly stated that submission of them to a jury as the standard of care would result in a speculative, ad hoc verdict completely unguided by any rational legal standards. The Nursing Home Patients' Bill of Rights is a laudable statement of policy and requirements imposed on licensed nursing homes with a remedial enforcement scheme which provides for injunctive relief and/or license revocation and administrative penalties. It may be relevant in a negligence case to show very generally a patient's expectations from a nursing home, but it is not a substitute, through the doctrine of negligence per se, for the well established standard of care to be applied in negligence actions for damages against health care providers.

■ Plaintiff would have the Court analogize the holding in *Tice v. Hall*, 310 N.C. 589, 313 S.E.2d 565 (1984), to her desire to utilize the doctrine of negligence per se. In *Tice v. Hall*, an operative sponge was found inside the plaintiff subsequent to an operation performed by the defendant. The evidence included expert testimony on the standard of care but the plaintiff was unable to produce any direct testimony that the defendant was responsible. The defendant argued that the doctrine of res ipsa loquitur had been superceded by N.C.Gen.Stat. § 90–21.12. The North Carolina Supreme Court held that N.C.Gen.Stat. § 90–21.12 does not displace res ipsa loquitur in medical malpractice cases. Res ipsa loquitur allows an issue of

whether a particular health care provider complied with the statutory standard under certain circumstances, usually when foreign bodies such as sponges, instruments, etc. are left in a patient's body during surgery, to be submitted to the jury even in the absence of direct proof of negligence. *Tice v. Hall*, 310 N.C. at 593–94, 313 S.E.2d at 567–68. Negligence per se does not send a case to the jury but sets the standard of care. Section 90–21.12 does not overrule or conflict with negligence per se. Irrespective of the legal and practical barriers to adopting the Nursing Home Patients' Bill of Rights as the standard of care in this case discussed previously, it is simply unnecessary to look to the doctrine of negligence per se in a negligence action against a health care provider. As the court in *Tice v. Hall* so aptly stated, "[N.C.Gen. Stat. § 90–21.12] establishes the standard of care in medical malpractice cases." 310 N.C. at 594, 313 S.E.2d at 568.

The Court's ruling that as a matter of law the Nursing Home Patients' Bill of Rights does not establish the standard of care to which defendant's conduct is to be judged was not a judgment on the factual sufficiency of plaintiff's claim against the defendant. The Court did not preclude plaintiff from introducing other evidence of the applicable standard of care. Viewed in the light most favorable to the plaintiff, the evidence showed that plaintiff essentially had two types of claims against the defendant: (1) a claim of physical abuse resulting in severe injury to Callie Cranfill, and (2) a claim that defendant was negligent in its daily residential care of Mrs. Cranfill, primarily in maintaining her and her room in a comfortable and sanitary condition. Plaintiff had not produced sufficient evidence, direct or circumstantial, of the cause of Mrs. Cranfill's March 1981 injuries and represented that she had no additional evidence on this element. The Court informed the parties that if sufficient probative evidence linked Mrs. Cranfill's condition to acts of the defendant's agents, the matter would be submitted to the jury on negligence, compensatory damages, and puni-

tive damages issues. Without question, the jury was capable of applying its own common knowledge and experience to the injuries pictured in Plaintiff's Trial Exhibits Nos. 1–4 to understand and judge whether the defendant's nursing care was negligent and outside the standard of care.

The Court considered whether plaintiff's other claims of negligence could be submitted to the jury without evidence of the standard of care from a qualified expert. Plaintiff purportedly found Mrs. Cranfill soiled or lying in her own waste innumerable times. This is to be expected of a senile, immobile person who has lost control of their bowel and bladder functions. The adage "once a man, twice a child" seems pertinent. The question insofar as legal negligence is concerned, is when must a nursing home remedy the situation. Like a parent with an infant, a nursing home cannot be expected to prevent the situation or in all circumstances to remedy it at once. On the other hand, the patient and linens should be cleaned at least at reasonably routine intervals. The question of when the time period between intervals becomes unreasonable is beyond the realm of common knowledge of the Court or the jury. Evidence from one who is familiar with the standards of practice or care is required. At a minimum such evidence would include, for example, the ordinary intervals at which patients without bowel and bladder control in intermediate and skilled nursing care should be checked and/or routinely cleaned, the frequency of patient problems, and the customary procedures employed to adequately care for these patients. Evidence of the customary training and qualifications of nursing home staff to deal with patients like Mrs. Cranfill and problems created by her condition would likewise be required.[5] This evidence would have to come from an expert. This does not mean that claimants like Mrs. Cranfill would have to go to extraordinary lengths or expense to provide such evidence. An expert is merely a person with specialized knowledge which is capable of assisting the trier of fact. Fed.R.Evid. 702; N.C.Gen.Stat. § 8–58.13. In this case, a nursing home administrator, director of patient services, registered nurse, or perhaps even an experienced licensed practical nurse could have possessed knowledge sufficient to qualify as an expert and assist the jury in ascertaining the standard of care applicable to the facts and in determining whether the defendant's conduct strayed from that legal standard and damaged Mrs. Cranfill.

Plaintiff did not offer any expert testimony and informed the Court that it would offer no evidence of the standard of care which the defendant owed Callie Cranfill other than the Nursing Home Patients' Bill of Rights. Thus, plaintiff's complete reliance on the doctrine of negligence per se to recover damages from a statutory health care provider left the Court with no alternative but to grant defendant's motion for a directed verdict.

IT IS, THEREFORE, ORDERED that this action be, and the same hereby is, DISMISSED.

A Judgment will be entered accordingly.

---

**5.** Counsel for plaintiff seemingly recognized this in his opening statement when he suggested that the defendant was negligent in employing persons who were not specifically trained to deal with elderly nursing home patients.