GERALD P. WILLIS, Administrator of the Estate of DAVID S. WILLIS, Deceased v. DUKE POWER COMPANY, a Corporation

No. 7826SC535

(Filed 21 August 1979)

1. **Death § 3— wrongful death action—death of primary beneficiary—no abatement**

A wrongful death action did not abate upon the death of decedent's mother, the primary beneficiary, pending trial of the action; rather, the action should be continued by decedent's administrator for the recovery of damages measured by the loss to decedent's mother up to the time of her death.

2. **Electricity § 7.1— ladder touching uninsulated wires—negligence—question of fact**

In an action to recover for the death of plaintiff's intestate which occurred when an aluminum ladder he was moving while painting a house came into contact with an uninsulated high voltage wire maintained by defendant power company, the evidence on motion for summary judgment presented a question of material fact as to defendant's negligence where it tended to show that another person had been electrocuted less than a year before when an aluminum ladder came into contact with the same uninsulated wire while painting the same house, and the wire was located only 3' 10" from the side of the house.

3. **Electricity § 8— ladder touching uninsulated wire—contributory negligence—question of fact**

In an action to recover for the death of plaintiff's intestate which occurred when an aluminum ladder he was moving while painting a house came into contact with an uninsulated high voltage wire maintained by defendant power company, the trial court erred in entering summary judgment for defendant on the ground that decedent was contributorily negligent as a matter of law where the evidence did not lead to the inescapable conclusion that decedent knew the location of the wires, knew that they carried a high voltage, or could have seen the wires from his location on the ground.

APPEAL by plaintiff from *Thornburg, Judge.* Judgment entered 17 January 1978 in the Superior Court, MECKLENBURG County. Heard in the Court of Appeals 7 March 1979.

Plaintiff's intestate, a young man 24 years of age, was killed on 4 October 1973, when the aluminum ladder he was attempting to move came near or in contact with one of defendant's uninsulated main distribution high tension wires located on property situate at 112 Tranquil Avenue, in Charlotte. Plaintiff alleged that approximately one year prior to his intestate's death, a former

owner of the property was killed "by electric current from the same uninsulated wires at the same place under the same or substantially similar circumstances as those alleged in this complaint," and that defendant, therefore, had notice of the "position, height, condition and obscurity of its naked high voltage wires and of the dangerous proximity of its wires to the house; and Duke Power had actual knowledge and notice of the extraordinary danger of said high tension wires to any person lawfully on or about the east side of said house, including particularly the owners of the property, their agents, employees, servants, licensees, invitees, guests or family, and particularly the inherent dangers to any person attempting to paint or perform any kind of work on the east side of the house requiring the use of a ladder." Plaintiff alleged further that his intestate was without knowledge that the wires were situate as they were, carried high voltage current, were uninsulated and otherwise unprotected, that he was exposed to extraordinary risks and special danger, or that a person had been electrocuted at the same location under substantially similar conditions a year earlier, but that even if he had known that Duke maintained uninsulated high voltage wires a few feet from the house he was painting, he was unable to see them or recognize that he was directly under them because of the height and thickness of the shrubbery, underbrush and trees all along the area on the east side of the property at 112 Tranquil Avenue.

Duke answered the complaint, denying all allegations of negligence, and setting up a plea of contributory negligence of plaintiff's intestate and alleging that the acts of negligence of plaintiff's intestate were the sole proximate cause of his death.

After extensive discovery, defendant moved for summary judgment, stating as grounds therefor the following: (1) the action had abated by reason of the death, after action was brought, of Elizabeth Shelton Willis, mother of the intestate, and sole beneficiary entitled to recover for his death under the wrongful death statute, (2) that defendant, as a matter of law, was not negligent, and (3) that plaintiff's intestate was contributorily negligent as a matter of law. The court granted defendant's motion on the grounds stated therein. Plaintiff appeals assigning as error the granting of the motion.

*Cansler, Lockhart, Parker & Young, by Thomas Ashe Lockhart, Joe C. Young, and John M. Burtis, for plaintiff appellant.*

*William I. Ward, W. Edward Poe, Jr., and Grier, Parker, Poe, Thompson, Bernstein, Gage & Preston, by William E. Poe and Irvin W. Hankins III, for defendant appellee.*

MORRIS, Chief Judge.

[1] The threshold question for decision on this appeal is whether the action abated upon the death of Elizabeth Shelton Willis, mother of decedent, after commencement of the action but pending trial. The trial court, by granting defendant's motion for summary judgment "based on the grounds stated in the motion", held that it did. We do not agree.

Resolution of this question of first impression in this State requires consideration of the former wrongful death statute, cases interpreting that statute, and the new wrongful death statute.

No right of action for wrongful death existed at common law, and it has oft been said that it was cheaper to kill than to injure. By "The Fatal Accidents Act", 1846, 9 & 10 Victoria, c. 93, §§ 1-6, commonly known as Lord Campbell's Act, a right of action for wrongful death was brought into being. Section 1 of that statute provided:

> "Whensoever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect, or default is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable if death had not ensued should be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to a felony."

This basic portion of Lord Campbell's Act has now been adopted by every State. There are differences among the States in the method of measuring damages and distributing recovery. The basic portion of Lord Campbell's Act was adopted in North Carolina in 1868-69 and remains in almost identical verbiage in

present G.S. 28A-18-2(a). (The 1969 Legislature rewrote G.S. 28-174, the damages section of the wrongful death statute, and the 1973 Legislature combined G.S. 28-173 and G.S. 28-174 into one statute designated as G.S. 28A-18-2.)

Prior to the 1969 amendment, the statute (G.S. 28-173) provided that the amount recovered in such an action would not be applied as an asset of the estate to the payment of debts of the decedent, except for burial expenses of the deceased and reasonable hospital and medical expenses not exceeding $500, "but shall be disposed of as provided in the Intestate Succession Act." G.S. 28-174 provided for the recovery of "such damages as are a fair and just compensation for the pecuniary injury resulting from such death." That language remained unchanged from 1869 to 1969. The Court construed the language to mean that the jury was required to determine the amount of money decedent would have earned during the period the jury should find he would have lived, determine and deduct his ordinary living expenses, and then ascertain the present net worth of the accumulation of those net earnings. The resulting figure represented the pecuniary value of the life of the decedent to his estate. *See Lamm v. Lorbacher*, 235 N.C. 728, 71 S.E. 2d 49 (1952). The statute made no provision for punitive damages, nor did it allow for nominal damages if there was no pecuniary loss. *Armentrout v. Hughes*, 247 N.C. 631, 101 S.E. 2d 793 (1958).

Under the former statute, it is very clear that the action did not abate upon the failure or absence of next of kin prior to judgment. *See* Note, Wrongful Death Damages in North Carolina, 44 N.C.L. Rev. 402, at 425. In *Warner v. The Railroad Co.*, 94 N.C. 250 (1886), the trial court had indicated that plaintiff's complaint was defective because it failed to allege in a wrongful death action that decedent left surviving him next of kin and refused to allow plaintiff to amend. Plaintiff submitted to a nonsuit and appealed. In addressing this question, the Court noted that the statute required that damages were not simply to be "distributed", but *"disposed of"*, (*id.* at 257) and that it appeared that the purpose of the statute was to give the right of action for the recovery of damages for wrongful death without regard to who might become beneficiaries, excluding, of course, creditors and legatees. The Court regarded this view as strengthened by the fact that the North Carolina statute was different from the

majority of statutes in the United States in that the statutes in most states provided for a designated beneficiary or beneficiaries —usually wife and children—and the measure of damages generally was made to depend on who was designated to receive the proceeds of the action. The Court in holding it unnecessary to allege the survival of next of kin, said:

"We are unable to see anything in the terms or purpose of the statute, that warrants such interpretation of it as would exclude the University from taking the damages recovered in the absence of next-of-kin. The statute, (The Code, Sec. 1498), in broad and comprehensive terms, gives the action; Sec. 1499, prescribes in terms quite as comprehensive, that the damages recoverable shall be such 'as are a fair and just compensation for the pecuniary injury resulting from such death,' and Sec. 1500 prescribes that such damages shall not be applied as assets in the payment of debts or legacies, 'but shall *be disposed of* as provided in this chapter, for the distribution of personal property, *in case of intestacy.*' It is observable that the damages are not simply to be *disposed* of as provided in this chapter for the *distribution* of *personal* property, but as '*in case of intestacy.*' These latter words are significant, as tending to show a definite purpose, to make a complete disposition in any case, of the damages. As we have seen, in case of intestacy, the personal property of the intestate is to be distributed, first, to the widow and children, or the legal representative of such child or children as may be dead; if there be none, the representative of children; then to the succeeding next-of-kin generally, and if the classes thus entitled, do not claim it in the way and within the time prescribed, it is just as certainly to be disposed of to the University.

It is said that the purpose of actions like this, is to provide for the widow and children of the intestate, and this is no doubt true, but it is likewise just as true and certain—the provision is plain—that their further purpose is to provide for the next succeeding next-of-kin, who, in many cases, have very little natural claim upon the intestate. The purpose of such actions reaches certainly beyond the claim of those who are first entitled to the benefit of the labor and efforts of the intestate. It seems to have been part of the purpose of the

statute giving the action and disposing of the damages recoverable in it, to give the latter to the University in case of the possible absence of next-of-kin. It has for a long period been the settled policy of the State, to dispose of unclaimed property in the hands of executors and administrators, to the University, and a like disposition is made of damages in actions like the present.

So, that in any case, the statute directs a disposition of the damages that may be recovered from the defendant in this action. It cannot, therefore, concern it to inquire who shall be entitled to take benefit of the same. It has no right or interest in that respect. Hence, it was not only not necessary, but it would have been improper, to allege in the complaint that there were next-of-kin of the intestate. Any issue raised in such respect, would have been beside the case, immaterial and improper." 94 N.C. at 259-60.

*See also Wilson v. Massagee*, 224 N.C. 705, 32 S.E. 2d 335 (1944); *McCoy v. R.R.*, 229 N.C. 57, 47 S.E. 2d 532 (1948); *Davenport v. Patrick*, 227 N.C. 686, 44 S.E. 2d 203 (1947); *Abernethy v. Utica Mutual Insurance Company*, 373 F. 2d 565 (4th Cir. 1967).

The Court also noted that in some states, though not uniformly so held, where the statutes designated the persons to take, it might be quite in order to require an allegation in the complaint of the existence of such persons, "because, in the absence of persons to take, the action would not lie." 94 N.C. at 260.

And in *Neill v. Wilson*, 146 N.C. 242, 59 S.E. 674 (1907), the Court said that the wrongful death statute gave clear indication of the intent of the Legislature to impress upon the right of action for wrongful death "the character of property as a part of the intestate's estate, and that, for the purpose of devolution and transfer, the rights of the claimants should be fixed and determined as of the time when the intestate died." *Id.* at 245.

A case strikingly similar in pertinent aspects to the one before us is the leading case of *Van Beeck v. Sabine Towing Co.*, 300 U.S. 342, 57 S.Ct. 452, 81 L.Ed. 685 (1937). There the Court was construing the portion of the Merchant Marine Act of 1920 (46 U.S.C.A. § 688) which provides (by reference to provisions of

Federal Employer's Liability Act, 45 U.S.C. § 51) in event of the death of a seaman, for an action for the benefit of "the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee." The seaman died unmarried, leaving surviving him his mother and several brothers. Thus the mother was the sole beneficiary of the statutory cause of action. She was appointed administratrix of her son's estate and, as administratrix, filed claim for damages. Pending determination of the suit, the mother died, and a brother of the deceased seaman was appointed to succeed her as administrator. The District Court dismissed the action on the ground that at the death of the mother, liability abated. The Court of Appeals affirmed. The Supreme Court granted certiorari and reversed. Mr. Justice Cardozo, writing the opinion for the Court, noted that the action is for the wrong to the beneficiaries and is confined to their pecuniary loss by his death and said:

> "Viewing the cause of action as one to compensate a mother for the pecuniary loss caused to her by the negligent killing of her son, we think the mother's death does not abate the suit, but that the administrator may continue it, for the recovery of her loss up to the moment of her death, though not for anything thereafter, the damages when collected to be paid to her estate. Such is the rule in many of the state courts in which like statutes are in force. It is the rule in New York, in Pennsylvania, in New Jersey, in Oklahoma, in Georgia, in Kentucky, in North Carolina, and under statutes somewhat different in Connecticut and Massachusetts. . . .
>
> When we remember that under the death statutes an independent cause of action is created in favor of the beneficiaries for their pecuniary damages, the conclusion is not difficult that the cause of action once accrued is not divested or extinguished by the death of one or more of the beneficiaries thereafter, but survives, like a cause of action for injury to a property right or interest, to the extent that the estate of the deceased beneficiary is proved to be impaired. To that extent, if no farther, a new property right or interest, or one analogous thereto, has been brought into being through legislative action. True, there are decisions under the death statutes of some states that teach a different

doctrine, refusing to permit a recovery by the administrator after the beneficiary has died, though the ruling has been made at times with scant discussion of the problem.

.  .  .

Death statutes have their roots in dissatisfaction with the archaisms of the law which have been traced to their origin in the course of this opinion. It would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied." 300 U.S. at 347-51, 57 S.Ct. 452, 81 L.Ed. at 688-90.

Although our wrongful death act was amended drastically in some respects in 1969, there was absolutely no change in the basic portions allowing the action and providing for the disposition of the recovery. The statute, now G.S. 28A-18-2(a), in language identical to the former statute, provides that the action shall be brought by the personal representative or collector of the decedent; that the amount recovered is not an asset of the estate for the payment of debts and legacies except for burial expenses and the $500 limitation on hospital and medical expenses; that the recovery "shall be disposed of as provided in the Intestate Succession Act." We find nothing in the amended statute which would, in any way, indicate any intent on the part of the Legislature that a wrongful death action should abate upon the death of the primary beneficiary pending determination of the action. We are aware that some states do hold that an action abates. Indeed, there are a few states which so provide by statute, and at least one which, by statute specifically provides that the action shall not abate upon death of the "person wronged". Tenn. 20-602. Our research discloses that in states which use the loss to the estate as the measure of damages, there is no abatement, because the existence of beneficiaries is not a requisite to the bringing of the action. In those states where the damages are measured by loss to the beneficiaries, the action abates only when the beneficiary who dies during the pendency of the action is the only surviving beneficiary who can qualify under the statute to receive the compensation for the wrongful death. *See Note*, Wrongful Death Damages in North Carolina, *supra*; *Annot.*, 13 A.L.R. 225 (1921); *Annot.*, 34 A.L.R. 1247 (1925); *Annot.*, 59 A.L.R. 760 (1929); *Annot.*, 43 A.L.R. 2d 1291 (1955). The cases cited

by defendant are cases from jurisdictions having entirely different statutory provisions with respect to those entitled to the recovery. Our conclusion that the General Assembly did not intend that the action abate in the circumstances of the case before us is bolstered by the fact that the new statute provides that the damages recoverable for wrongful death shall include "nominal damages when the jury so finds" G.S. 28A-18-2(b)(6); this, in spite of and in addition to the provisions that damages shall include "the present monetary value of the decedent to the persons entitled to receive the damages recovered, . . ." G.S. 28A-18-2(b)(4). The intimation that there shall not be an abatement is, we think, quite clear in the statute, and there is nothing which indicates that the court's interpretation of the former statute should not be just as applicable to the present statute.

[1]  For the reasons set out, the court erred in granting the motion for summary judgment on the grounds that the action had abated. The action shall be continued by the administrator for the recovery of damages measured by the loss to decedent's mother up to the time of her death, in accordance with the provisions of G.S. 28A-18-2(b).

We turn now to the question of whether the court erred in granting the motion for summary judgment on the ground that defendant, as a matter of law, was not negligent, or on the ground that plaintiff's intestate was contributorily negligent as a matter of law.

In determining whether a movant is entitled to summary judgment under G.S. 1A-1, Rule 56, we must first determine whether there is no genuine issue of material fact and then whether movant is entitled to judgment as a matter of law. *Page v. Sloan*, 281 N.C. 697, 190 S.E. 2d 189 (1972), and cases there cited. Summary judgment is a rather drastic remedy and one to be granted cautiously. This is particularly true in actions alleging negligence as a basis for recovery. In *Gladstein v. South Square Assoc.*, 39 N.C. App. 171, 173-74, 249 S.E. 2d 827, 828-29 (1978), *cert. denied*, 296 N.C. 736, 254 S.E. 2d 178 (1979), we said:

> "Nevertheless, it has often been said by the courts of this and many other jurisdictions that only in exceptional cases involving the question of negligence or reasonable care will summary judgment be an appropriate procedure to resolve

the controversy. (Citations omitted.) The propriety of summary judgment does not always revolve around the elusive distinction between questions of fact and law. Although there may be no question of fact, when the facts are such that reasonable men could differ on the issue of negligence courts have generally considered summary judgment improper. (Citations omitted.) Judge Parker for this Court explained:

'This is so because even in a case in which there may be no substantial dispute as to what occurred, it usually remains for the jury, under appropriate instructions from the court, to apply the standard of the reasonably prudent man to the facts of the case in order to determine where the negligence, if any, lay and what was the proximate cause of the aggrieved party's injuries.' *Robinson v. McMahan*, 11 N.C. App. at 280, 181 S.E. 2d at 150; *see also Edwards v. Means*, supra.

The jury has generally been recognized as being uniquely competent to apply the reasonable man standard. *See generally* Prosser, Torts § 37 at 207 (4th Ed. 1971). Because of the peculiarly elusive nature of the term 'negligence', the jury generally should pass on the reasonableness of conduct in light of all the circumstances of the case. This is so even though in this State '[w]hat is negligence is a question of law, and when the facts are admitted or established, the court must say whether it does nor does not exist.' *McNair v. Boyette*, 282 N.C. 230, 236, 192 S.E. 2d 457, 461 (1972)."

[2] Applying these principles to the facts of the case before us as contained in depositions, affidavits, and interrogatories, in addition to the sworn pleadings and admissions, we cannot agree that the court properly entered summary judgment based on the ground that defendant, as a matter of law, was not negligent.

Less than a year before the death of plaintiff's intestate, and on 28 October 1972, Nelson L. Hale, Jr., died as the result of electrocution which occurred on the same premises. There, too, the decedent had been engaged in painting the house trim. The plaintiff's intestate there had been the owner of the house, and he was using an aluminum extension ladder. In maneuvering the ladder, Hale brought it into contact with the defendant's uninsulated wires at the same place on the premises. We think what we said

in that case, *Hale v. Power Co.*, 40 N.C. App. 202, 204-05, 252 S.E. 2d 265, 267-68 (1979), is just as applicable here as it was there.

> "Our courts have repeatedly stated that a supplier of electricity owes the highest degree of care. *See Small v. Southern Public Utilities Co.*, 200 N.C. 719, 158 S.E. 385 (1931), and cases cited therein. This is not because there exists a varying standard of duty for determining negligence, but because of the 'very dangerous nature of electricity and the serious and often fatal consequences of negligent default in its control and use.' *Turner v. Southern Power Co.*, 154 N.C. 131, 136, 69 S.E. 767, 769 (1910). 'The danger is great, and care and watchfulness must be commensurate to it.' *Haynes v. The Raleigh Gas Co.*, 114 N.C. 203, 211, 19 S.E. 344, 346 (1894). 'The standard is always the rule of the prudent man,' so what reasonable care is 'varies . . . in the presence of different conditions.' *Small v. Southern Public Utilities Co.*, *supra* at 722, 158 S.E. at 386.
>
> We cannot agree with defendant's argument that the 'prudent man' rule has been supplanted by the requirements of the National Electrical Safety Code, adopted in 1963 as Rule R8-26 of the North Carolina Utilities Commission. Even assuming that defendant complied with the Code, we cannot say that such compliance would make defendant free of negligence as a matter of law. Taking the evidence for the moment in the light most favorable to the defendant, the record shows that the wires here were 7200 volt distribution lines (a much higher voltage than that of the house service lines, which in this case carried 122 and 240 volts) which passed the east side of the Hale house 3' 10" from the side of the house, and 22' 7" above the ground, clearances which complied with the National Electrical Safety Code. The distribution line was uninsulated, also in compliance with the Code. The house was Tudor style and had two stucco and wood gables, the lowest 18' and the highest 24' 8".
>
> On these facts there is a genuine issue of material fact relating to defendant's duty to insulate the high voltage wires maintained in such close proximity to a house which would obviously need maintenance, such as paint. In *Williams v. Carolina Power & Light Co.*, 296 N.C. 400, 402, 250 S.E. 2d

255, 257 (1979), our Supreme Court noted the rule in this jurisdiction with regard to the duty to insulate wires:

'That the duty of providing insulation should be limited to those points or places where there is reason to apprehend that persons may come in contact with the wires, is only reasonable. Therefore, the law does not compel companies to insulate . . . their wires everywhere, but only at places where people may legitimately go for work, business, or pleasure, that is, where they may be reasonably expected to go.' (cite omitted)

Moreover, we cannot say that the alleged negligence of defendant could not have been the (sic) proximate cause of Hale's injury. As noted in *Williams, supra* at 403, 'it is only in exceptional cases, in which reasonable minds cannot differ as to foreseeability of injury, that a court should decide proximate cause as a matter of law. "[P]roximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case." ' The factual occurrences of this case do not present such an exceptional case, and it is for a jury to determine whether defendant did all it was required to do under the circumstances."

[3] We must now consider whether the court erred in allowing defendant's motion for summary judgment on the ground that plaintiff's intestate was contributorily negligent as a matter of law. Again we must disagree with the trial court.

We are certainly aware of the rule, which is well settled in this State, that a person has a legal duty to avoid contact with an electrical wire of which he is aware and which he knows may be very dangerous. *Alford v. Washington*, 244 N.C. 132, 92 S.E. 2d 788 (1956). "That does not mean, however, that a person is guilty of contributory negligence as a matter of law if he contacts a known electrical wire regardless of the circumstances and regardless of any precautions he may have taken to avoid the mishap." *Williams v. Power & Light Co.*, 296 N.C. 400, 404, 250 S.E. 2d 255, 258 (1979).

---

---

In the cases on which defendant relies, *Floyd v. Nash*, 268 N.C. 547, 151 S.E. 2d 1 (1966); *Lambert v. Duke Power Co.*, 32 N.C. App. 169, 231 S.E. 2d 31 (1977), *cert. denied*, 292 N.C. 265, 233 S.E. 2d 392 (1977); *Bogle v. Duke Power Co.*, 27 N.C. App. 318, 219 S.E. 2d 308 (1975), *cert. denied*, 289 N.C. 296, 222 S.E. 2d 695 (1976), plaintiff's intestate had been explicitly warned about the specific wire which subsequently killed him. The evidence before the court in the case before us leaves to conjecture whether the plaintiff's intestate knew the location of the uninsulated high voltage wire or could have seen it even if he knew of its location.

Charles F. Edwards, Jr., by deposition, testified that he met David Willis (plaintiff's intestate) and James S. Thompson at the Tranquil Avenue house on 4 October 1973 for the purpose of showing them what painting needed to be done on the house. Mrs. Baylis, the owner of the house, had shown Mr. Edwards what she wanted done some week prior to this date, and she was around that day. She met them in the front yard and walked around the house with them. At that time, nothing was said about wires. They walked around the east side of the house, where the accident occurred, but Edwards did not notice any wires. Willis and Thompson started working. Between 10:00 and 10:30 Edwards returned to the Baylis house with additional equipment for Willis and Thompson. At that time they were on the west side of the house. As he was leaving, Mrs. Baylis stopped him and said, "Charlie, there are some wires back there, back of the house, that if you touch them you could get electrocuted", gesturing with her arms toward the rear of the house. He told her the painters needed to hear it, so they walked over to where they were, and she repeated it but did not motion to the rear of the house. She was very casual about it. He noticed some telephone wires going to the middle of the back of the house and thought they were the wires about which she was talking. "At no time prior to the death of David Willis did I notice the wires on the east side of the house . . . Prior to David Willis's death, I did not know that the wires that were lying along the east side of the Baylis's house were not insulated. I did not notice the wires at all, as a matter of fact. They were almost hidden . . . It was difficult to see them because they have a lot of cane and shrubbery and it's very dark so any wire would be difficult to see around that area on the east side. It's very dark, therefore, making it difficult to see any wire on

the east side . . . concerning my observations the day after the accident when the wires had been put back up, they were extremely, extremely difficult to see at that time. I was amazed that Tommy, who had been painting and who had almost finished the east side, had not been killed because they were extremely difficult to see. Unless you were really looking for them, you could not—you would not notice them. You would not have noticed them." The growth on the east side of the house was thick and at least 15' high. "When I looked up to see the top of the greenery, I did not see any wires at all that I noticed."

James Thompson testified that he did not hear any conversation between Mrs. Baylis and Edwards about the wires; that about mid-afternoon Mrs. Baylis came out with a friend. He was working on the east side of the house. She said there were some live wires in the back of the house and to be careful and to tell David. "I told David. I told him that Mrs. Baylis had said there were some live wires and that we should be careful. There were some drop wires that led to the back that came into the house for the appliances and telephone and whatever. I assumed those were the ones because we were right there beside them and he said okay, he'd watch it. When Mrs. Baylis told me and when I went back to tell him to be careful, I did not see the wires that ran along the easterly edge of the property. Later in the afternoon, when I was beside them sitting on the roof, I noticed them over to my side." Mrs. Baylis never pointed to the particular wires. Thompson did not think David heard Mrs. Baylis because he was in the back of the house on the roof and was around the corner where Thompson was sitting on the roof. She was out of sight of David and the radio was playing loudly. David never painted on the east side. David came over for them to decide whether to stop for the day. They decided to try to finish. David knew how to move the ladder and Thompson had never done it. He helped David stand it up and David began to move the ladder when it was in an upright position. A couple of seconds later, Thompson heard the noise. David had moved four or five steps with the ladder.

With respect to whether the lines were easily seen, Mrs. Baylis testified: "I have a problem seeing the wires. To me, the trees obscured the lines and when you are that close to the house in a seven foot area with the overhanging bamboo, you have a

very crowded feeling." She said her husband had worked on that side of the house and had no problem with seeing the wires. She said when she told Edwards to be careful of the wires she indicated the east side of the house. She did not mention Hales's death because she thought the situation had been corrected. She said she cautioned the boys three or four times. At the time she talked to Thompson on the east side of the house, David was in the back of the house "ten to twenty feet, well maybe more than that, away". She believed her voice was loud enough for him to hear it.

Her husband testified, as did others, that the wires were not obstructed by the shrubbery.

Evidence of the people who were at the scene at various times during the day does not lead to the inescapable conclusion that plaintiff's intestate knew the location of the wires, knew that they carried the voltage that they did, could have seen the wires from his location on the ground, or, as a matter of fact, negligently moved the ladder.

Even if there were no contradictions in the evidence, and there are, we think "reasonable men could differ on the issue of negligence." *Gladstein v. South Square Assoc., supra.* It follows that the trial court erroneously entered summary judgment for defendant based on plaintiff's intestate's contributory negligence as a matter of law.

For the reasons stated in this opinion, the judgment of the trial court must be

Reversed.

Judges CLARK and ARNOLD concur.