JOAN CABANISS SMITHERS v. W. J. COLLINS, M.D.

No. 8027SC666

(Filed 2 June 1981)

**Physicians, Surgeons, and Allied Professions § 17.2 — medical malpractice — negligence in post-operative care — sufficiency of evidence**

     Plaintiff's evidence was sufficient for the jury in a medical malpractice action based on the failure of defendant obstetrician-gynecologist to discover an intestinal blockage which developed following surgery performed by defendant on plaintiff and which necessitated a second operation where it tended to show that plaintiff had every symptom of an intestinal obstruction and so advised defendant; defendant failed, in contravention of good medical practice, to give plaintiff a pelvic examination or to check for high-pitched bowel sounds with a stethoscope but gave her pain pills and told her that her problem was her nerves; the intestinal blockage was present when defendant examined plaintiff approximately a month after the surgery; the blockage was discovered by another physician some five weeks after defendant performed surgery on plaintiff; and an earlier diagnosis of bowel blockage and insertion of a bowel tube at that time could have obviated surgery to remove the blockage.

APPEAL by plaintiff from *Lewis, Judge.* Judgment entered 14 February 1980 in Superior Court, CLEVELAND County. Heard in the Court of Appeals 4 February 1981.

    This is a medical malpractice action in which plaintiff appeals from a court order granting a directed verdict in favor of defendant physician, W. J. Collins. Plaintiff alleged in her complaint that defendant was negligent in performing a complete hysterectomy upon her[1] and in caring for her following the operation, by failing to discover an intestinal blockage which developed post-operatively and which necessitated a second operation. Defendant, Dr. Collins, in his answer denied the allegations of negligence. He admitted, however, that following his 17 March 1975 abdominal hysterectomy on plaintiff, plaintiff was hospitalized on 21 April 1975 and "referred to Dr. Rowell Cloninger, who later operated on her by reason of a diagnosis that she had an obstruction of the small [distal] bowel." The evidence at trial is summarized below.

---

    1. Although the plaintiff alleged that the defendant did not exercise due care during the operation, there was no evidence to support this allegation. Plaintiff's appeal concerns only the defendant's post-operative care of her.

Plaintiff called defendant, Dr. Collins, as a witness, and the parties stipulated that he was a medical expert in obstetrics and gynecology. Dr. Collins testified that plaintiff first came to him in February, 1975 with various complaints, and he diagnosed dysmenorrhea, a menopause syndrome, and adenomyosis, a benign condition in which "the uterus is basically worn and torn and tired out and congested, painful, tender, slightly enlarged and irregular." Because plaintiff had had a uterine suspension operation in 1974 and was sterilized, Dr. Collins recommended a hysterectomy. During the surgery on 17 March 1975, Dr. Collins discovered that, as a result of the previous surgery (the uterine suspension operation), plaintiff had developed adhesions—tissue bands which form during the healing process following surgery—involving the uterus, the space behind the uterus, and the tubes and ovaries on each side. During his operation, Dr. Collins severed the adhesions which he found and cleaned them up in an effort to prevent them from re-forming. Dr. Collins testified that adhesions develop in the first several days following surgery as a normal part of the healing process and that adhesions that do not disappear spontaneously develop into stronger fibrous adhesions within five to ten days. These fibrous adhesions sometimes "bind down the organ that's involved in the area" of the surgery. The distal small bowel, or ileum, is often the organ involved, and its normal function may be affected, though many people live a full and normal life with a partial bowel obstruction following surgery.

Plaintiff remained in the hospital from 17 March 1975 to 25 March 1975 when she was discharged. Hospital notes on the plaintiff indicated that her progress during the eight days she remained hospitalized following surgery was good; that she was ambulatory; and that her bladder, blood count, and temperature were normal.

Plaintiff testified that while in the hospital, she informed Dr. Collins that she was not having spontaneous bowel movements and that she was nauseated, but could not vomit because of stomach soreness. Dr. Collins responded by telling her it was her nerves and by giving her nerve pills. (No hospital notes were made concerning bowel movements, but plaintiff was given enemas on 20, 21 and 22 March while hospitalized.) Dr. Collins testified: "Constipation, however, is a very, very common finding

after surgery, and probably fifty percent of patients do not have bowel movement on their own by the time they leave the hospital."

Following plaintiff's discharge from the hospital, she informed Dr. Collins that her condition had not changed. Specifically, she testified:

> After I got home, I did not have a bowel movement. I continued to have no bowel movement, so I called Dr. Collins about every day.
>
> . . .
>
> At that time, I was still sick on my stomach, two or three times a morning, night — anytime I eat food, I throw it back up. I advised Dr. Collins of this and he said he thought it was my nerves. From the time I was discharged from the hospital until I went back into the emergency room, [21 April 1975] I called him a number of times, about every day, and saw him once.

On the question of Dr. Collins' post-operative treatment of her, plaintiff testified:

> I only saw Dr. Collins one time from the time I left the hospital when Dr. Collins operated on me until I went into the hospital the time Dr. Cloninger operated on me. Relative to a pelvic examination, Dr. Collins only gave me some pills and told me he had to leave to go to the hospital for an emergency. He did not make any examination of me. He did not put a stethoscope on my stomach. He did not give me a pelvic examination. I asked to see him approximately every day.

Dr. Collins, testifying from his medical records, indicated that he saw plaintiff on two separate occasions: 1 April 1975, when she "wanted him to check her incision where she had a little area that was draining"; and 14 April 1975 at which time he gave her a pelvic examination to check how she was healing. Dr. Collins also testified that he did not use a stethoscope to check for bowel sounds — high-pitched crescendo sounds that indicate intestinal blockage — because his pelvic examination did not give him a hint that there was any distended bowel suggesting a partial or im-

pending obstruction at that time and because what plaintiff told him did not indicate that there was any trouble.

On 21 April 1975 (seven days after Dr. collins said he examined plaintiff and one day after plaintiff had returned from a trip to Myrtle Beach), plaintiff was admitted to the emergency room with acute abdominal pain. She was also vomiting. She was seen by Dr. Collins' partner, Dr. Binion. Dr. Binion's differential diagnoses included a mild or partial bowel obstruction resulting from adhesions. Plaintiff was subsequently admitted to the hospital and eight days later, on 29 April 1975, Dr. Rowell Cloninger operated on plaintiff to relieve her of a partial obstruction of the lower small bowel. Dr. Cloninger found that a loop of bowel had become attached by "early fibrous adhesions, which would have to mean that the particular area of blockage had been there at least ten days." Dr. Cloninger also found a couple of loops of recent adhesions that were a day or two old.

Dr. Cloninger, who was also called by plaintiff as an expert witness, testified that after he made his diagnosis, he treated plaintiff conservatively—he tried enemas and he put a small bowel tube in plaintiff's nose and throat. Plaintiff swallowed the tube, and the natural waves or contractions in the small bowel carried the tube from the stomach into the intestine, where it was used to remove the liquid contents from the bowel in order to relieve any distention that plaintiff had. Dr. Cloninger decided to operate when subsequent tests showed that the plaintiff "wasn't emptying good." Dr. Cloninger testified that if plaintiff's condition had been diagnosed earlier, he would "absolutely still have tried the conservative treatment rather than the surgery first."

Following plaintiff's evidence—the testimony of Dr. Collins, Dr. Cloninger, and the plaintiff—Dr. Collins moved for a directed verdict. The court granted the motion and plaintiff appealed.

*Hamrick & Hamrick, by Nat Hamrick, for the plaintiff appellant.*

*Golding, Crews, Meekins, Gordon & Gray, by J. G. Golding, for defendant appellee.*

BECTON, Judge.

The single question presented by this appeal is whether the trial court erred in granting defendant Collins' motion for a

directed verdict at the close of plaintiff's case. Plaintiff argues that her evidence was sufficient to show prima facie (1) that Dr. Collins did not follow the established standard of care in that he failed to examine her, even though she, as a post-operative patient, complained of distention, nausea and vomiting for two weeks following her discharge from the hospital; (2) that once a patient makes the complaints that she made, good medical practice dictates that a treating physician perform a pelvic examination and listen to the patient's abdomen with a stethoscope; (3) that Dr. Collins did not perform a pelvic examination or listen to her abdomen, but rather, gave her pain pills and told her that her problem was her nerves; and (4) that the chances of relieving adhesions with a bowel tube — and obviating surgery — are better if adhesions are diagnosed early. Plaintiff contends that the testimony from Dr. Collins and Dr. Cloninger established the standard of care in the community and that her evidence showed that Dr. Collins did not follow that standard of care.

Dr. Collins contends, on the other hand, that plaintiff's evidence failed to establish any causal relationship between his care of her, or failure to examine her, and the partial bowel obstruction that she subsequently developed. Since Dr. Cloninger testified that the delay, if any, made no difference in his (Dr. Cloninger's) treatment of her, nor did it affect her need for the operation, Dr. Collins argues that plaintiff's evidence fails to show (1) that she had the intestinal obstruction during the time between her discharge from the hospital and the time she left for Myrtle Beach; (2) that she should have been administered a different treatment by Dr. Collins; and (3) that different treatment would have avoided the need for the bowel obstruction operation.

Although plaintiff's testimony as to the nature and extent of her contacts with Dr. Collins and the examinations and treatments which Dr. Collins gave her post-operatively are confusing,[2] we are required to consider evidence offered on behalf of the plaintiff as true, and to resolve all conflicts of evidence in her favor. *Anderson v. Carter*, 272 N.C. 426, 158 S.E. 2d 607 (1968); *Edwards v. Johnson*, 269 N.C. 30, 152 S.E. 2d 122 (1967); *Harris v. Wright*, 268 N.C. 654, 151 S.E. 2d 563 (1966). Plaintiff is further

---

2. On direct and re-direct examination, plaintiff testified she only saw Dr. Collins once post-operatively; on cross-examination she suggests that she may have seen him at least two times post-operatively.

"entitled to all reasonable inferences in her favor which properly may be drawn from the evidence." *Wilson v. Hospital*, 232 N.C. 362, 365, 61 S.E. 2d 102, 104 (1950). *See also Price v. Tomrich Corp.*, 275 N.C. 385, 167 S.E. 2d 766 (1969); *Bowen v. Gardner*, 275 N.C. 363, 168 S.E. 2d 47 (1969).

To the well-established rule giving the plaintiff the benefit of the doubt on a motion for nonsuit, we append another: judicial caution is particularly called for in actions alleging negligence as a basis for recovery. *See Williams v. Power & Light Co.*, 296 N.C. 400, 402, 250 S.E. 2d 255, 257 (1979); *Willis v. Power Co.*, 42 N.C. App. 582, 590, 257 S.E. 2d 471, 477 (1979); *Gladstein v. South Square Assoc.*, 39 N.C. App. 171, 173-74, 249 S.E. 2d 827, 828 (1978), *cert. denied*, 296 N.C. 736, 254 S.E. 2d 178 (1979). Because the allocation of liability in negligence actions requires the application of the reasonable, prudent person test, the jury is generally "recognized as being uniquely competent to apply the reasonable man standard." 39 N.C. App. at 174, 249 S.E. 2d at 829. In order for the jury to pass on the reasonableness of a physician's conduct in *many* medical malpractice cases, however, there is a requirement that expert testimony is needed to establish the standard of care, *Hawkins v. McCain*, 239 N.C. 160, 79 S.E. 2d 493 (1954); *Jackson v. Sanitarium*, 234 N.C. 222, 67 S.E. 2d 57 (1951), *rehearing denied*, 235 N.C. 758, 69 S.E. 2d 29 (1952); *Wilson v. Hospital*, 232 N.C. 362, 61 S.E. 2d 102 (1950), and the proximate cause of the plaintiff's injury, *Jackson v. Sanitarium; Starnes v. Taylor*, 272 N.C. 386, 158 S.E. 2d 339 (1968). This expert testimony is generally required when the standard of care and proximate cause are matters involving highly specialized knowledge beyond the ken of laymen. It has never been the rule in this State, however, that expert testimony is needed in *all* medical malpractice cases to establish either the standard of care or proximate cause. Indeed, when the jury, based on its common knowledge and experience, is able to understand and judge the action of a physician or surgeon, expert testimony is not needed. We have found no stronger nor clearer statement than that of Justice Barnhill in *Jackson v. Sanitarium*:

> Yet this Court has not and *could not* go so far as to say that in no event may a physician or surgeon be held liable for the results of his negligence unless the causal connection between the negligence and the injury or death be established

by the testimony of a brother member of defendent's profession. . . . [S]uch a rule would erect around the medical profession a protective wall which would set it apart, freed of the legal risks and responsibilities imposed on all others.

It is true it has been said that no verdict affirming malpractice can be rendered in any case without the support of medical opinion. If this doctrine is to be interpreted to mean that in no case can the failure of a physician or surgeon to exercise ordinary care in the treatment of his patient [the standard of care], or proximate cause, be established except by the testimony of expert witnesses, *then it has been expressly rejected in this jurisdiction. Groce v. Myers* [224 N.C. 165, 29 S.E. 2d 553 (1944)]; *Wilson v. Hospital,* [232 N.C. 362, 61 S.E. 2d 102 (1950)]; *Covington v. James,* 214 N.C. 71, 197 S.E. 701; *Gray v. Weinstein,* 227 N.C. 463, 42 S.E. 2d 616.

Rightly interpreted and applied, the doctrine is sound. Opinion evidence must be founded on expert knowledge. *Usually,* what is the standard of care required of a physician or surgeon is one concerning highly specialized knowledge with respect to which a layman can have no reliable information. As to this, both the court and jury must be dependent on expert testimony. Ordinarily there can be no other guide. For that reason, in many instances proximate cause can be established only through the medium of expert testimony. *There are others, however, where non-expert jurors of ordinary intelligence may draw their own inferences from the facts and circumstances shown in evidence.* (Citations omitted.) (Emphasis added.)

234 N.C. at 226-27, 67 S.E. 2d at 61-62. And when the standard of care is established either by expert or non-expert testimony, "departure therefrom may, in most cases, be shown by non-expert witnesses." *Id.* at 227, 67 S.E. 2d at 62.

This is not a case "concerning highly specialized knowledge with respect to which a layman can have no reliable information." *Id.* at 227, 67 S.E. 2d at 61. Applying the facts of this case to the law long established by our courts, we conclude, based on the following discussion, that plaintiff has carried her burden on the standard of care issue and on the proximate cause issue.

With regard to the standard of care in diagnosing intestinal obstructions, Dr. Collins testified:

We know that the average patient, for the first two or three days [after major abdominal surgery] does not have a bowel movement, because their colon is sluggish.

.   .   .

[W]e try to minimize any possibility of distention if the lack of bowel movement continues and if the patient does not have a spontaneous bowel movement, then we prescribe enemas; . . . Then, if the enemas don't work and the patient has clinical signs of abnormal distention, which means marked distention, we check for bowel sounds. If the bowel sounds, instead of being a normal, intermittent, low, rumbling type [is] a real high-pitched crescendo type, that indicates to us that there may be some blockage; and then we have to go further with maybe stronger enemas and possibly get an x-ray to see if there is what we call a paralytic ileus present, or, indeed, intestinal obstruction.

.   .   .

If this problem of no bowel movement continues, it is normal to do an x-ray to find out if there is an obstruction. I would do it if enemas did not release or promote normal bowel movements, if the patient had signs that were more than usual for the distention we described . . . then we would order an x-ray to see if, indeed, there were an obstruction.

.   .   .

I might add, not having bowel movements is a common problem until the patient gets into a normal active phase of life again.

.   .   .

Usually, you at least have one bowel movement seven or eight days after the operation. In the absence of these bowel movements, the normal treatment or investigation that you would do at that time would be an x-ray. The first x-ray is what they call a KUB, which basically is just an x-ray of the abdomen to see — for gas patterns — and see if you have some

hint that there may be obstructions, small or large bowel. Then you go to the barium. After you've done these two things you know whether or not the bowel is obstructed.

.   .   .

If the patient tells us they are having a lot of distention and abdominal pain, and if we can see the distention, then we usually check it with the stethoscope. Or, when we do the pelvic exam, we can feel distended bowel inside, and at that time then we go to the stethoscope.

.   .   .

One of those tests would have indicated whether her bowels were functioning normally or not.

.   .   .

It would have only taken a moment to put a stethoscope  n her stomach and see if her bowels were functioning properly.

.   .   .

[Where a patient complains of acute abdominal pain], nausea and vomiting and pain [and has bowel signs that are hyperactive], we would ascertain whether there was possibly an impending obstruction or an acute infection by placing a stethoscope on her stomach.

.   .   .

It's [a stethoscope] one of our better tools and had she made this complaint, I feel that I would have done that as good practice, and under those circumstances, it would have been a normal practice that physicians in my position in this area would have done.

Dr. Cloninger, who was also called as an expert witness by the plaintiff, testified:

So if they have signs of obstruction, which is distention, nausea, and vomiting, crampy abdominal pain, failure to pass gas and have bowel movements, then you investigate it . . . . If after ten days after an operation, the patient comes to me and says they have had no bowel movements at all, I would check the abdomen to see whether they are distended. As to what I do about listening to it, very frequently, listen.

We hold that this evidence on the "standard of care" was sufficient to allow, but not compel, the jury to find each material fact necessary to make out a case of actionable negligence. Simply put, the jury could have believed plaintiff. There was testimony and inferences from which the jury could have found that plaintiff had every sign and symptom of an intestinal obstruction and so advised Dr. Collins; that Dr. Collins failed, in contravention of good medical practice, to give plaintiff a pelvic examination or to check for high-pitched bowel sounds with a stethoscope; and that the intestinal blockage was present on 14 April 1975. This latter finding could have been based on the testimony of Dr. Cloninger, who found an intestinal obstruction when he operated on 29 April and who stated that "this loop of bowel was attached by what we call earlier fibrous adhesions, which would have to mean that the particular little area of blockage *had been there at least ten days* [or at least since 19 April 1975, five days after Dr. Cloninger testified he examined plaintiff]." The jury may have disbelieved Dr. Collins, who said he gave plaintiff a pelvic examination and "indirectly" determined the condition of her bowels. Dr. Collins testified:

> If there had been a tip-off — partial or impending obstruction, I believe I would have felt distended bowels; I believe at that time, she would have complained with more pain referable to this, which, indeed, would have led to more investigation . . . I felt the pelvic exam did not give me a hint that there was anything going on, plus what she told me.

Whether this testimony from Dr. Collins was sufficient to rebut the evidence offered by the plaintiff was for the jury to decide.

We note that Dr. Collins' "professional learning, skill and ability which others similarly situated ordinarily possess," *Hunt v. Bradshaw*, 242 N.C. 517, 521, 88 S.E. 2d 762, 765 (1955), have not been questioned; but

> it is not enough to absolve a physician or surgeon from liability that he possess the requisite professional knowledge and skill. He must exercise reasonable diligence in the application of that knowledge and skill to the particular patient's case and give to that patient such attention as his case requires from time to time.

*Galloway v. Lawrence*, 266 N.C. 245, 247-48, 145 S.E. 2d 861, 864 (1966). Dr. Collins' duty to the plaintiff did not end upon the completion of the operation; Dr. Collins was required to use reasonable and ordinary care, skill and diligence in the post-operative care of plaintiff. *See Starnes v. Taylor*; and *Galloway v. Lawrence*. Expert testimony is not always necessary to establish a medical standard of care. Moreover, once a standard of care is established, our courts have made it clear that expert testimony is not essential to show a departure from that standard of care. In this case, non-expert jurors of ordinary intelligence could "draw their own inferences from the facts and circumstances shown in evidence." *Jackson v. Sanitarium*, 234 N.C. App. at 227, 67 S.E. 2d at 61-62.

Although the evidence may have been sufficient to support a jury finding that Dr. Collins was negligent in failing to exercise the "established standard of care," was there sufficient evidence to show that Dr. Collins' failure to furnish the requisite degree of care proximately caused plaintiff's condition? Arguing that plaintiff has failed to show that earlier or different treatment would have avoided the bowel obstruction and the necessary corrective operation, Dr. Collins urges us to uphold the judge's order granting a directed verdict.

We are not persuaded. We hold that the evidence was sufficient to take the case to the jury on the proximate cause issue, also. Although Dr. Cloninger testified that he would have treated plaintiff conservatively by placing a small bowel tube through her nose and into her intestinal tract to relieve the distention before doing any surgery, it is clear that plaintiff was distended and had a partial obstruction to the lower small bowel when this small bowel tube was inserted. Moreover, the jury could have found from the evidence presented that an earlier diagnosis and an earlier insertion of this bowel tube could have relieved the distention and broken the adhesions that interfered with the function of the bowels. Dr. Collins himself gave testimony which is sufficient for this purpose:

> And by the process of decompression [passing a tube that goes through the stomach and into the small bowel and sucks out the foodstuff and fluids] *many times the bowel is relieved of this distention and, on occasion, adhesions can break with this procedure without doing the surgery.* (Emphasis added.)

Dr. Cloninger's testimony was not as positive. In response to the question "Well, the sooner you diagnose an obstruction or a partial obstruction, the better your chance is to get by without surgery, isn't it?" Dr. Cloninger responded, "Not necessarily." In explaining his answer, Dr. Cloninger later indicated that "[t]he earlier you get the tube in after you make a diagnosis of obstruction [the tube may break them loose], but the thing that the tube mainly does is to keep other loops of bowels from getting involved in the obstruction." Although Dr. Collins' testimony differs somewhat from Dr. Cloninger's testimony, the jury could have found that an earlier diagnosis of bowel blockage and an earlier insertion of a bowel tube would have obviated surgery. Given this possibility it was improper for the judge to take the case from the jury by way of a directed verdict. For this reason, we

Reverse.

Chief Judge MORRIS and Judge VAUGHN concur.